UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

IVAN KILGORE,

Plaintiff,

v.

RICHARD MANDEVILLE, et al.,

Defendants.

No. 2:07-cv-2485 TLN KJN P

FINDINGS AND RECOMMENDATIONS

I. Introduction

Plaintiff is a state prisoner, currently incarcerated at California State Prison-Sacramento (CSP-SAC), under the authority of the California Department of Corrections and Rehabilitation (CDCR). Plaintiff proceeds in forma pauperis and without counsel,[1] in this civil rights action, filed pursuant to 42 U.S.C. § 1983, premised on plaintiff's Eighth Amendment claims that defendants were deliberately indifferent to plaintiff's serious medical needs. Pending for decision is defendants' motion for summary judgment, filed on June 28, 2013. (ECF No. 142.) Plaintiff

[1] On September 9, 2011, this court granted plaintiff's request for appointment of counsel (ECF No. 100), and appointed counsel on September 16, 2011 (ECF No. 101). However, on October 17, 2012, after conducting depositions, counsel requested permission to withdraw (ECF No. 124), which the court granted on October 23, 2012 (ECF No. 127). Notwithstanding the withdrawal of his appointed counsel, plaintiff's opposition to the instant motion is thorough and well documented.

timely filed an opposition. (ECF No. 147).

For the reasons that follow, this court recommends that defendants' motion for summary judgment be granted. While the court appreciates that Mr. Kilgore's medical challenges have been significant, the evidence fails to demonstrate that any defendant responded to plaintiff's serious medical needs with deliberate indifference.

II. Background

This action proceeds on plaintiff's Amended Complaint, filed on December 7, 2007 (ECF No. 5), against the following eight defendants: physicians Jasdeep Bal, Gabriel Borges, and James Wedell; Licensed Vocational Nurses Marcus Winton and Gloria Forshay; Utilization Manager and Registered Nurse Nancy Dunne; Health Care Manager and psychologist Karen Kelly; and Correctional Officer Gregory Hampton.[2] Plaintiff contends that these defendants were deliberately indifferent to plaintiff's serious medical needs associated with an inverted papilloma in plaintiff's right nostril. The court has liberally construed plaintiff's allegations against each of the defendants, as set forth in the Amended Complaint, plaintiff's declaration, and his opposition to the pending motion.

III. Legal Standards

A. Legal Standards for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P.

[2] The magistrate judge previously assigned this case found that plaintiff's Amended Complaint failed to state a cognizable claim against defendants Brimhall, Jennings, Mandeville, Nicholson, or Spinks. (See ECF No. 7 at 7-8.)

56(c).) "Where the nonmoving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex, 477 U.S. at 325); see also Fed. R. Civ. P. 56 Advisory Committee Notes to 2010 Amendments (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact"). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

Consequently, if the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists. See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

trial." T.W. Elec. Serv., 809 F.2d at 630. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) Advisory Committee's Note to 1963 Amendments).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 586 (citation omitted).

By notice dated June 28, 2013 (ECF No. 144), plaintiff was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

B. Legal Standards for Assessing Deliberate Indifference to Serious Medical Needs

"[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain, proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle v. Gamble, 429 U.S. 97, 104-05 (1976) (internal citations, punctuation and quotation marks omitted). "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they 'deny, delay or intentionally interfere

with medical treatment.'" Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990) (quoting Hutchinson v. United States, 838 F.2d 390, 394 (9th Cir. 1988)).

"A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc) (quoting Estelle, 429 U.S. at 104). Serious medical needs include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; [and] the existence of chronic and substantial pain." McGuckin, 974 F.2d at 1059-60.

To prevail on a claim for deliberate indifference to serious medical needs, a prisoner must demonstrate that a prison official "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994).

"In the Ninth Circuit, the test for deliberate indifference consists of two parts. First, the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Second, the plaintiff must show the defendant's response to the need was deliberately indifferent. This second prong . . . is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal citations, punctuation and quotation marks omitted); accord, Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012); Lemire v. CDCR, 726 F.3d 1062, 1081 (9th Cir. 2013).

"The indifference to a prisoner's medical needs must be substantial. Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this claim. Even gross negligence is insufficient to establish deliberate indifference to serious medical needs." Lemire, 726 F.3d at 1081-82 (internal citations, punctuation and quotation marks omitted); accord, Cano v. Taylor,

739 F.3d 1214, 1217 (9th Cir. 2014). Moreover, "[a] difference of opinion between a physician and the prisoner -- or between medical professionals -- concerning what medical care is appropriate does not amount to deliberate indifference." Snow v. McDaniel, 681 F.3d 978, 987 (9th Cir. 2012) (citing Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir.1989)).

Whether a defendant had requisite knowledge of a substantial risk of harm is a question of fact. "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. The inference of knowledge from an obvious risk has been described by the Supreme Court as a rebuttable presumption, and thus prison officials bear the burden of proving ignorance of an obvious risk. . . . [D]efendants cannot escape liability by virtue of their having turned a blind eye to facts or inferences strongly suspected to be true . . . ." Coleman v. Wilson, 912 F. Supp. 1282, 1316 (E.D. Cal. 1995) (citing Farmer, 511 U.S. at 842-43) (internal quotation marks omitted).

When the risk is not obvious, the requisite knowledge may still be inferred by evidence showing that the defendant refused to verify underlying facts or declined to confirm inferences that he strongly suspected to be true. Farmer, 511 U.S. at 842. On the other hand, prison officials may avoid liability by demonstrating "that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." Id. at 844. Thus, liability may be avoided by presenting evidence that the defendant lacked knowledge of the risk and/or that his response was reasonable in light of all the circumstances. Id. at 844-45; see also Wilson v. Seiter, 501 U.S. 294, 298 (1991); Thomas v. Ponder, 611 F.3d 1144, 1150-51 (9th Cir. 2010).

IV. Facts

The court has reviewed defendants' Statement of Undisputed Facts (ECF No. 143), plaintiff's Statement of Disputed Facts (ECF No. 147-2), plaintiff's declaration (ECF No. 147-1), and the defendants' various declarations, deposition transcripts, and discovery responses, together with the record evidence. The following facts are undisputed by the parties or, following the court's review, have been deemed undisputed for purposes of the pending motion. Pertinent

allegations are also noted.

1. Plaintiff was born on May 5, 1974. In April 2004, plaintiff commenced serving a life sentence without the possibility of parole, under the authority of CDCR. At all times relevant to this action, plaintiff has been incarcerated at CSP-SAC.

2. This action proceeds against the following eight defendants, all employed at CSP-SAC during the relevant period:

a. Physicians Dr. Jasdeep Bal, Dr. Gabriel Borges, and Dr. James R. Wedell; Dr. Bal served as CSP-SAC Chief Medical Officer/Health Care Manager (CMO/HCM from May 2007 through May 2009).

b. Licensed Vocational Nurses (LVN) Marcus Winton and Gloria Forshay;

c. Utilization Manager and Registered Nurse (UM Nurse) Nancy Dunne;

d. Chief Psychologist Dr. Karen Kelly, in her capacity as Acting Health Care Manager (HCM), from January 2006 until May 2007; and

e. Correctional Officer (CO) Gregory Hampton.

3. When admitted to CDCR in April 2004, plaintiff underwent a physical examination; it was noted that plaintiff had a history of seasonal allergies since 2001.

4. On March 19, 2005, plaintiff submitted a Health Care Services Request Form ("sick-call slip"), complaining that he had not received his sinus medications. On March 21, 2005, the B-Facility Nurse examined plaintiff, noted his history of seasonal allergies, and prescribed Chlorpheniramine.

5. On October 5, 2005, plaintiff complained of headaches, especially when reading or watching television. Plaintiff obtained an ophthalmology consultation.

6. On December 9, 2005, plaintiff submitted a sick-call slip complaining of problems breathing out of his nose, without relief from his allergy medications, stating: "Sinus problems, can't breathe well out of my nose. Previous sinus med no help need something stronger." (Pltf. Exh. at 2.) Plaintiff also complained of "bumps" on the back of his head, and requested an ice chrono to treat his arthritis. (Id.) On December 13, 2005, RN Edmondson examined plaintiff and noted that he had seasonal allergies for the past three to four years, but that his eyes and nose

were clear. The nurse assessed a "stuff (sic) nose," and referred plaintiff to a physician on a "routine" basis. (Dfs. Exh. B at 9.)

7. On December 30, 2005, plaintiff was seen by defendant Dr. Wedell for the first time pertinent to this action. (Dfs. Exh. B at 10, 86.) Plaintiff states that Dr. Wedell used an anterior rhinoscopy to perform a "cursory examination" of his nasal cavities. (Pltf. Decl. at ¶ 5.) This is the first date that plaintiff was diagnosed with a nasal polyp. Reviewing his treatment notes for plaintiff on this date, Dr. Wedell explained as follows (Wedell Decl. at ¶¶ 7-9):

> After examining Kilgore I noted allergic rhinitis with red, swollen nostrils, but no discharge. Kilgore's oral pharynx was within normal limits and his lungs were clear. My assessment was that Kilgore had allergic rhinitis with nasal polyps, and I prescribed Benadryl and topical nasal steroids.
>
> Inflammatory polyps, such as those I diagnosed in Kilgore, are associated with allergic rhinitis, and are generally benign growths.
>
> The community standard of practice for the treatment of nasal polyps relies mostly on an anti-inflammatory effect of antihistamines and topical steroids. Occasionally a supplemental burst of oral steroids are effective in shrinking the size of the polyps.

Dr. Wedell prescribed Benadryl (Diphenhydramine), and Nasarel nasal spray (Flunisolide, or Nasalide, an anti-inflammatory glucocorticosteroid), as well as Naproxen to treat plaintiff's arthritis. (Dfs. Exh. B at 10, 86; Pltf. Exh. at 5.)

8. On January 26, 2006, plaintiff was seen at the medical clinic for complaints of a "stuffy nose," for the past two to three months, stating that his current medications were "ineffective." (Id. at 88.) The attending nurse, RN Ogbeide, submitted a sick-call slip on behalf of plaintiff, and referred plaintiff to the medical line for further evaluation.

9. Dr. Wedell renewed plaintiff's prescription for Benadryl on January 17, 2006, January 25, 2006, and February 3, 2006, without seeing plaintiff. (Pltf. Exh. at 5.) On February 6, 2006, Dr. Borges, without seeing plaintiff, renewed his prescription for Flunisolide, and prescribed Sudafed/Actifed (Triprolidine/Pseudodeophedrine). (Id. at 5-6, 15-6; Dfs Exh. B at 11.)

10. On February 9, 2006, plaintiff submitted a sick-call slip complaining that he was "recently referred to see the doctor for sinus problems," but the appointment was cancelled.

Plaintiff stated that he "was given meds for sinus [b]ut wasn't seen for the bumps (rash) on the back of my head. I request to see the Dr. as referred by the nurse to examine this rash in my head. ASAP." (Dfs. Exh. B at 154.)

11. On February 21, 2006, plaintiff was seen by defendant Dr. Borges for the first time pertinent to this action. Plaintiff states that Dr. Borges conducted a "cursory clinical examination" with "the assistance of an anterior rhinoscopy," and concluded that plaintiff had "a common nasal polypsis (nasal polyp)." (Pltf. Decl. at ¶ 13.) Plaintiff states that, despite explaining to Dr. Borges that plaintiff had "been prescribed these medications on February 9th, [and] they were ineffective (the Flunisolide) and the Sudafed provided temporary relief[,] [t]he defendant insisted I continue taking the prescribed medications until the next follow-up visit." (Id.) Dr. Borges also prescribed Benzoyl peroxide gel, for a three-month period, to treat the rash on plaintiff's head. (Id.; Dfs. Exh. B at 12; Pltf. Exh. at 6, 16.)

12. On March 6, 2006, plaintiff was seen for the second time by Dr. Borges. Plaintiff states that he told Dr. Borges his "breathing complications had became worse and, again, the prescribed medications were now completely ineffective." (Pltf. Decl. at ¶ 14.) Plaintiff avers that Dr. Borges explained that medical staff needed to first prescribe "any and all sinus medications available at the prison pharmacy to show they were ineffective," as a "prerequisite" to referring plaintiff to the Ears, Nose and Throat Clinic (ENT) at the University of California at Davis (UCD). (Id.) Dr. Borges reportedly stated that this requirement was imposed by the "Health Care Manager (defendant Kelly) at CSP-SAC." (Id.) Dr. Borges's treatment notes indicate plaintiff's complaints of nasal swelling since August 2005; Dr. Borges diagnosed allergic rhinitis; added a prescription for Claritin (Loratadine), while continuing Nasarel and Actifed; and asked plaintiff to return in 6 to 8 weeks. (Borges Depo. at 13-7, and Exhs. 3-5; Pltf. Exh. at 20; Dfs. Exh. B at 13.) Dr. Borges also prescribed the antibiotic tetracycline to treat plaintiff's rash. (Id.)

13. Plaintiff requested the discontinuation of oral Benadryl on March 8, 2006. (Dfs. Exh. B at 14.) On March 23, 2006, plaintiff requested refills of his prescriptions for Actifed and Nasarel; and, on April 5, 2006, plaintiff requested a refill of his prescription for Actifed and

requested an antacid. (Dfs. Exh. B at 155-56.)

14. Plaintiff states that, on April 6, 2006, he "was again seen by defendant Borges . . . regarding gas. During this visit I informed the defendant that the sinus medications were ineffective and that my breathing complications were worse. The defendant prescribed an antacid and renewed Actifed." (Pltf. Decl. at ¶ 15; accord, Dfs. Exh. B at 15 (Dr. Borges' treatment notes); Pltf. Exh. at 6, 21.)

15. On April 17, 2006, upon examining plaintiff, Dr. Borges submitted a Physician Request for Services (RFS), requesting that plaintiff be scheduled for an initial outpatient diagnostic appointment with UCD-ENT, to examine plaintiff's right nasal polyp. Dr. Borges noted that plaintiff had the polyp for "yrs," that he could not breathe out of his right nostril, and that his medications weren't working. The service request was designated "routine." (Dfs. Exh. B at 18; see also Borges Depo. at 18-22; id., Exhs. 8-11.) (Plaintiff states that Dr. Borges denied plaintiff's request to designate the request "urgent." (Pltf. Decl. at ¶ 16.)) The request was received by defendant Dunne, the Utilization Management (UM) Nurse, on April 20, 2006, who approved it on May 9, 2006.[3] Dunne thereafter forwarded the request to the CSP-SAC schedulers, who reportedly faxed the request to UCD-ENT. (Dfs. SUDF at ¶ 26; Dunne Depo. at 9-14.)

16. On May 19, 2006, plaintiff had a 30-day follow-up appointment with Dr. Borges, who added a prescription for the oral steroid Prednisone. (Dfs. Exh. B at 91; Borges Depo. at 26-7; Pltf. Exh. at 7.)

17. On May 25, 2006, plaintiff was seen by Nurse Nicholson for a rash; the nurse, in consultation with Dr. Penner, opined that the rash may be an allergic reaction to the Prednisone, which was discontinued. Dr. Borges saw plaintiff on May 26, 2006, confirmed discontinuation of the Prednisone, and renewed plaintiff's prescription for Benadryl. (Dfs. Exh. B. at 20-1, 92; Pltf. Exh. at 26.)

---

[3] Defendants state that defendant Dunne was able to approve this pre-authorized diagnostic service without referring the request to the Medical Authorization Review (MAR) Committee. (See Dfs. SUDF at ¶¶ 22-4; accord, Dunne Depo. at 9-14.)

18. On July 6, 2006, plaintiff submitted a sick-call slip, wherein he requested the renewal of his prescription for Actifed, and requested "to see Dr. Borges regarding my sinus condition." (Dfs. Exh. at 160.) The attending nurse submitted the refill request, and scheduled plaintiff for a "monthly follow up" on July 14, 2006. (Id.)

19. On July 14, 2006, plaintiff was seen by an "unknown doctor," pursuant to a "Thirty (30) Day Specialty Consultation Progress Note." This physician noted plaintiff's obstructive right nasal polyp; found plaintiff's condition stable; found that plaintiff's scheduled specialty appointment in "August 1st two weeks" was clinically appropriate; and advised plaintiff to continue his nasal steroids. (Dfs. Exh. B at 95.) Plaintiff avers that this physician telephoned defendant UM Nurse Dunne in plaintiff's presence, and requested that the appointment be made.

20. On July 23, 2006, plaintiff submitted a sick-call slip, wherein he stated (Dfs. Exh. at 161):

> I'm currently scheduled for a nasal sergery. My symptoms have progressed to the point that I can see the pallips in my nostral. I can't breath and I've developed a constant nasal drain in my right nostral. I request to see the Dr.

21. On July 26, 2006, plaintiff was examined by RN Cunningham, who noted plaintiff's approximate one-year history of nasal polyps, and his complaints of throbbing headache pain (designated an "8" on an ascending scale from 0 to 10). (Dfs. Exh. B at 96.) The nurse noted that plaintiff was scheduled for an ENT consult for the first week of August, and referred plaintiff to the physician's clinic. (Id.; Pltf. Decl. at ¶ 24.)

22. On August 1, 2006, plaintiff filed an "Inmate Request for Interview" with defendant Kelly, in her position as Health Care Manager (HCM). The request provided in full (Pltf. Exh. at 362):

> On 4/17/06, Dr. Borges submitted a RFS for me to seen @ the ENT Clinic. I've yet to be seen. As a result of the delay of treatment, I'm experiencing pain and suffering related to an every-increasing nasal polyp. I have filed numerous sick call slips with no results. Request that immediate arrangements be made for surgery to remove polyp.

////

23. On August 9, 2006, plaintiff was seen for the first time by Dr. Duc (not a defendant in this action), who noted that plaintiff had a large right nostril polyp since August 2005, and that it was "obstructing totally" plaintiff's right nostril. (Dfs. Exh. B at 97.) Dr. Duc changed Dr. Borges' April 17, 2006 Physician RFS from "routine" to "urgent," and gave the updated request to defendant UM Nurse Dunne. The request was returned with a notation that plaintiff's appointment was scheduled for August 31, 2006. (Id. at 24, 97; Dunne Decl. at ¶ 17.)

24. On August 28, 2006, plaintiff submitted a sick call slip, and was seen by RN Cunningham on August 30, 2006. (Pltf. Exh. at 54.) Plaintiff complained that his nasal condition had been diagnosed in April, but he had not yet received treatment; that he was suffering "nose bleeds, severe head[ache]s and breathing complications and dizziness;" and that his pain level was at a 9 to 10, on an ascending scale from 0 to 10. (Id.) The nurse noted that plaintiff had an ENT consultation scheduled.

25. On August 31, 2006, plaintiff was seen for the first time at UCD-ENT, by Dr. Vishal Doctor. In his report (signed by Dr. Doctor on September 6, and faxed to CSP-SAC on September 20, 2006), Dr. Doctor noted plaintiff's complaints of a right-sided nasal mass for 9 months and that it "was increasing in size." (Dfs. Exh. B at 203.) Dr. Doctor noted plaintiff's complaints of discomfort, nasal obstruction and mucous discharge. Dr. Doctor further noted (id.):

> It has mainly been causing problems with nasal obstruction. He denied any facial numbness or weakness. He denies any epistaxis [bleeding]. He denies any changes in his vision. He does have drainage of a moderate amount of mucous when he blows his nose from the right side. He also does have some discomfort from his sinuses when he sleeps at night. He has no history of recurrent sinus infections. . . . He has tried Flonase as well as Benadryl and Actifed for this without much benefit. He has never had a biopsy or any other procedure on the mass.

Examination with an anterior rhinoscopy revealed the following (id.):

> On the right side he has a very large polypoid mass, which extends up to the nasal vestibule and fills the entire right nasal cavity. Visualization distal to this was not possible. The mass is slightly friable and nontender. It was not actively bleeding. His septum is intact. The left side of the nasal cavity appears normal. There are no masses and no polyps.

////

Dr. Doctor recommended the following course of action (id.):

> Prior to biopsy or operative intervention, we would like to obtain imaging of this. I have ordered a facial CT with stealth protocol with contrast in order to better evaluate this mass in its extent. The differential includes nasal polyposis, inverting papilloma, or nasal carcinoma. Depending on the extent of the MRI, we will then probably schedule him for operative biopsy versus debridement. We will see him again after the CT scan is done.

26. On September 14, 2006, plaintiff saw Dr. Bal for the first time, as a follow-up visit to plaintiff's UCD-ENT consultation. However, Dr. Bal had not yet received a copy of Dr. Doctor's August 31, 2006 report, and his efforts to obtain the report from the CSP-SAC "consult desk" were unsuccessful. (See Dr. Bal's Sept. 14, 2006 Treatment Note (Pltf. Exh. at 58).)

27. On September 22, 2006, Dr. Bal submitted a Physician RFS for the recommended CT scan. (Pltf. Exh. at 59; Dfs. Exh. B at 27.) The request was received that day by defendant Dunne, the CSP-SAC Utilization Manager (UM) Nurse, who approved the request on October 3, 2006. (Id.) The request included no requested time frame.

28. On September 26, 2006, plaintiff was seen by Dr. Bal for complaints of right knee pain. Dr. Bal called the consult desk to ascertain the date of the CT scan at UCD, and was told that they were "awaiting schedule through UCD-ENT." Dr. Bal made a notation that plaintiff should follow up with him in 30 days. (Dfs. Exh. B at 98.)

29. On October 20, 2006, plaintiff was seen by Dr. Wedell for complaints of arthritis pain. Dr. Wedell prescribed Naproxen, and provided plaintiff with a low bunk chrono. (Wedell Depo. at 17-20, and Exhs. 8, 9.)

30. On October 25, 2006, the CT scan was conducted at UCD. The findings were as follows (Dfs. Exh. B at 205):

> There is a large soft tissue mass in the right maxillary sinus breaking through into the nasal cavity and ethmoid region, which contains an internal region of high attenuation approximately 1 cm in diameter which may represent destroyed bone or possibly contrast enhancement. The sphenopalatine fossa is compressed and extension into the fossa cannot be excluded. No breakthrough into the brain is identified. The bone, the sinus is also remodeled as well as destroyed. [¶] Squamous cell carcinoma, or other pathology cannot be excluded.

////

31. The October 26, 2006 CT scan report was received by CSP-SAC on October 31, 2006. Dr. Bal reviewed the report the same day, and submitted a Physician RFS, requesting an "urgent" follow up appointment for plaintiff at UCD-ENT. (Dfs. Exh. B at 32-3; Pltf. Exh. at 63.) Defendant UM Nurse Dunne approved the request the same day, on October 31, 2006. (Id.)

32. On November 15, 2006, Dr. Wedell prescribed hemorrhoid cream for plaintiff, at the request of a nurse. (Wedell Depo. at 20-1, and Exh. 10.)

33. On November 17, 2006, plaintiff was seen by defendant Dr. Wedell, pursuant to a "Thirty (30) Day Specialty Consult Progress Note." Although Dr. Wedell noted that plaintiff's condition had worsened (with occasional nosebleeds and headaches), he noted that plaintiff had received paperwork for his next UCD appointment, a biopsy, and confirmed with the consult desk that it was scheduled; Dr. Wedell found that the scheduled biopsy date (although not indicated on the progress note) was "clinically appropriate." (Pltf. Exh. at 67; Pltf. Decl. at ¶ 46; see also Wedell Depo. at 21-4, and Exhs. 11, 12.)

34. On November 22, 2006, plaintiff was seen by defendant Dr. Bal, at the C-Facility clinic, with whom he discussed the results of the CT scan "at great length," and who confirmed with the consult desk that plaintiff had a further appointment with UCD-ENT "very soon." Dr. Bal noted that he would follow-up with plaintiff after his next ENT appointment. (Pltf. Exh. at 68.)

35. On November 29, 2006, the operative biopsy was performed at UCD by Dr. James Tate. The procedure included "aggressive debridement" and suction of the tumor. Plaintiff was to return within two days for removal of his post-surgical nasal packs. (Dfs. Exh. B at 206-07.) Dr. Tate prescribed an antibiotic (Keflex) and pain medication (Vicodin, 500 mg every 4-6 hours, for 5 days, as needed). (Pltf. Exh. at 71.)

36. On the evening of November 30, 2006, plaintiff complained of a rash. RN Nicholson opined that plaintiff's rash was a side effect to Vicodin. The nurse called Dr. Reddy, between 10:50 p.m. and 11:10 p.m., who directed the discontinuation of Vicodin and ordered an injection of, and 5-day prescription for, Benadryl. (Pltf. Exh. at 9, 72-4; Pltf. Decl. at ¶ 49.)

////

37. On December 1, 2006, plaintiff was seen by Dr. Bal, who prescribed an alternative pain medication, Percocet (Oxycodone/APAP (7.5/325), 1 tab every 6 hours for 7 days). (Pltf. Exh. at 74, 76-7.) However, plaintiff states that he did not receive his first dose of Percocet until 8 p.m., on December 1, 2006, and asserts that he was therefore without pain medication and "in agony" for approximately 24 hours. (Pltf. Decl. at ¶ 49; Pltf. SDF at ¶ 42.)

38. The next day, on December 2, 2006, plaintiff was informed "at pill call" that the dosage of Percocet he was receiving was "out of stock" at the CSP-SAC pharmacy and they were seeking an alternative. Plaintiff was not provided Percocet at 8:00 a.m., or 12:00 p.m. (Pltf. Exh. at 458.) Plaintiff states that, by 3:00 p.m., his "pain became unbearable; I was then experiencing severe pain, dizziness and a migraine." (Pltf. Decl. at 53.) At 3:20 p.m., Dr. Wedell prescribed a different dosage of Percocet (Oxycodone/APAP (5/325), 1 tab every 6 hours for 7 days). (Pltf. Exh. at 75, 80.)

39. Meanwhile, plaintiff states that he had to inform Dr. Bal, on December 1, 2006, that his nasal packing was to be removed at UCD within two days of the biopsy. Reportedly, upon inquiry, Dr. Bal was told by UM Nurse Dunne that no such arrangements had been made, and Dr. Bal asked that they be made immediately. Plaintiff states that he was taken to UCD-ENT that day for removal of his nasal packing. (Pltf. Decl. at ¶ 49-50.)

40. After the removal of plaintiff's nasal packing, on December 1, 2006, UCD's Dr. Tate prescribed Afrin Nasal Spray to reduce inflammation; the prescription order was made on the same day by Dr. Wedell. However, plaintiff states that the spray was not provided to him until December 3, 2006. (Pltf. Exh. at 78-9, 85. Pltf. Decl. at ¶ 51-2; Pltf. SDF at ¶ 42.) Dr. Wedell testified that he did not know the reason for the delay. (Wedell Depo. at 24-7, and Exhs. 13, 14.)

41. On December 8, 2006, UCD Otolaryngologist Dr. Scott Fuller met with plaintiff to discuss the November 29, 2006 biopsy results, and recommended surgery. In a report received by CSP-SAC on December 28, 2006, Dr. Fuller provided the following biopsy results (Dfs. Exh. B at 208):

> The patient's pathology came back as an inverted papilloma and we had a discussion with him today about the prospect of a lateral rhinotomy and medial maxillectomy on the right side for resection

> of the inverted papilloma. [¶] The patient is in agreement with the plan and a booking slip has been submitted and we are waiting an OR date and preop date at this point in time. We will keep you advised of any additional appointments in regard to his upcoming surgery.

42. Also on December 8, 2006, following his UCD appointment, plaintiff was examined by Dr. Bal. Plaintiff states that he conveyed to Dr. Bal the results of his biopsy and surgical recommendation. Dr. Bal noted that plaintiff had no symptoms of nose bleeding, diplopia (double vision), fever or chills; that his medications were up to date; that plaintiff was awaiting a return to UCD-ENT for surgery, and had a follow-up appointment "very soon;" Dr. Bal noted that he would follow-up post-surgically. (Pltf. Exh. at 90.)

43. On December 18, 2006, plaintiff was again seen by Dr. Bal, pursuant to a "Thirty (30) Day Specialty Consult Progress Note." (Pltf. Exh. at 91.) Dr. Bal found plaintiff's condition stable, and noted plaintiff's statements that his biopsy did not reveal a malignancy, and that he was "currently enrolled for surgery for further treatment (esp. excision) of R nasal mass." (Pltf. Exh. at 91.) Plaintiff states that he asked Dr. Bal to verify arrangements for his surgery; that Dr. Bal spoke with UM Nurse Dunne, who reportedly expressed her misconception that the biopsy had been the recommended surgery, and informed Dr. Bal that she would make arrangements for the surgery. (Pltf. Decl. at ¶ 58.) Dr. Ball found the "scheduled appointment" to be "clinically appropriate." (Pltf. Exh. at 91.)

44. On January 17 and 30, 2007, Dr. Wedell approved unrelated prescription requests for plaintiff. (Wedell Depo. at 37-8, and Exhs. 21, 22.)

45. On January 18, 2007, after allegedly submitting a sick-call slip, plaintiff was seen by Family Nurse Practitioner (FNP) Blackwell. Plaintiff complained, inter alia, of a lack of follow-up treatment for his nasal polyp. On the same day, "per Dr. Fuller – Otolaryngology at UCD," FNP Blackwell submitted a Physician RFS, requesting an "urgent" outpatient referral to UCD-ENT for removal of plaintiff's "nasal/sinus mass," and noted that pre-op procedures had already been conducted. The request was approved [signature illegible] on January 23, 2007. (Pltf. Exh. at 92-3.)

////

46. On February 16, 2007, plaintiff submitted a sick-call slip complaining that he was "suffering from a tumor in my sinuses that I believe to have grown to the point that it's now causing some damage to the nerves in my eye for I'm experiencing involuntary twitching of my left eye." (Pltf. Exh. at 94.) Plaintiff was seen by Dr. Wedell on February 21, 2007, who noted, despite his calls to the consult desk being unanswered, that plaintiff was awaiting his next UCD-ENT appointment. (Id. at 95.) Dr. Wedell prescribed Tramadol (50 mg) for 30 days, and told plaintiff to return in three weeks. Dr. Wedell testified that he didn't recall what pain he was treating, but it might have been for plaintiff's knee. (Wedell Depo. at 38, and Exh. 22.)

47. On February 22, 2007, plaintiff was transported to UCD-ENT for his pre-operative evaluation. Dr. Kolstad and Dr. Kees noted in pertinent part (Pltf. Exh. at 65-6):

> [T]he patient originally noticed this mass approximately one year ago. He was subsequently referred to our clinic. Biopsy demonstrated inverting papilloma. Radiographic evidence revealed opacification of his right maxillary sinus with extension past the septum as well as superiorly to the ethmoids. It was therefore recommended that he undergo lateral rhinotomy approach for resection of this tumor due to its extent. . . .
>
> The benefits as well as the risks of the procedure, which including bleeding, infection, damage to surrounding vessels, nerves, structures, loss of vision, CSF leak, nasal obstruction, recurrence, need for re-procedure were discussed with the patient. However, despite these risks, he stated he would like to proceed as planned.

48. On February 26, 2007, UCD-ENT surgeons Dr. Donald and Dr. Chopra performed on plaintiff's nose a lateral rhinotomy, medial maxillectomy, and complete right ethmoidectomy. The "Postoperative Plan" provided that "[t]he patient will be monitored in-house for five to seven days before his packing is removed. He will then be started on saline irrigation to prevent crusting. He will follow up in one week's time." (Dfs. Exh. B at 215-16.)

49. Six days later, on March 4, 2007, plaintiff was seen by UCD pain management pharmacist, Dr. Ryan Cello. Plaintiff complained of constant pain on the right side of his face, including his right teeth, and sharp headache behind his right eye, but manageable with pain medications; plaintiff also complained of significant itching, which Dr. Cello opined was a side effect to plaintiff's pain medications. Dr. Cello noted that plaintiff was currently prescribed Percocet, MS Contin, Roxanol, and Morphine. The pharmacist suggested continuing the MS

Contin but, if the itching continued, to switch to Oxycontin. Dr. Cello discontinued the Roxanol, but continued the Percocet (5/325 mg, 1 to 2 tabs every 4 to 6 hours, as needed for pain), noting that the "patient reports good pain relief from 2 Percocets." (Pltf. Exh. at 98-100.) Dr. Cello continued plaintiff's prescription for Morphine as long as he remained in the hospital. Plaintiff was instructed to continue taking Benadryl, to relieve his itching. Finally, Dr. Cello emphasized that, when plaintiff was ready for discharge, the prison should be contacted to verify the availability of his pain medications, noting that plaintiff had reported a problem getting prescribed medications after his biopsy. (Dfs. Exh. B at 223-24; Pltf. Exh. 98-100.)

50. On March 5, 2007, while plaintiff was still at UCD, his nasal pack and sutures were removed. Dr. Donald ordered that plaintiff would remain in the hospital for an additional 24 hours but, if there was no further bleeding, plaintiff could be released back to the prison the following day. (Dfs. Exh. B at 226-27; see also id. at 221-22.)

51. The following day, on March 6, 2007, plaintiff was discharged to CSP-SAC at approximately 1:05 p.m. The admitting nurse at the prison's Treatment and Triage Area (TTA), RN Valente, noted plaintiff's prescriptions and, with Dr. Bal's authorization, forwarded them to the CSP-SAC pharmacy. These included MS Contin (30 mg, twice a day for 7 days), Percocet (Oxycodone) (5/325 mg, 1 tab three times a day as needed, for 7 days), Benadryl, saline nasal spray, and sterile Q-tip packages to be exchanged one-to-one for fourteen days, to enable plaintiff to provide his own wound care. (Pltf. Exh. at 10, 100-02.)

52. Plaintiff alleges that RN Valente telephoned Dr. Bal in plaintiff's presence to request a reduction in plaintiff's Percocet dosage, "from one (1) to two (2) tabs every four hours, to one (1) tab three times a day as needed," allegedly because otherwise "the amount of pain medication was too much for [plaintiff] to have in the general population." (Pltf. Decl. at ¶ 65.) Plaintiff alleges that Dr. Bal reduced the dosage as requested, without reviewing Dr. Cello's report or examining plaintiff.

53. Later on March 6, 2007, plaintiff was moved to the general population in CSP-SAC's C Facility, Building 6. At this time, defendant Correctional Officer Hampton was working in the Control Booth (aka Tower). Plaintiff alleges that, at approximately 2:30-3:00 p.m., he began

experiencing severe pain, and requested that defendant Hampton contact medical staff concerning plaintiff's need for pain medication. Defendant Hampton did so, and then conveyed to plaintiff that medical staff (allegedly defendant LVN Winton) refused to provide the requested medication, stating that it would be provided at the evening pill call. When plaintiff explained to Hampton that he had not had any pain medication since that morning at the UCD Medical Center, Hampton stated that he had done all he could and that plaintiff would need to take the matter up with medical staff at a later time. Hampton declined to pursue the matter further and ordered plaintiff back to his cell. (Pltf. Decl. at ¶ 66; Pltf. Exh. at 103-05.)

54. Still later on March 6, 2007, at approximately 5:30-5:45 p.m., plaintiff's cellmate, D. Lakey, told defendant Hampton that plaintiff's pain had worsened, and requested that Hampton contact medical staff. Hampton refused but apparently directed Correctional Officer Omand (who was working on the floor) to check on plaintiff. Omand went to plaintiff's cell. When plaintiff attempted to comply with Omand's order that plaintiff to approach the cell door, plaintiff slowly collapsed to the floor, without injury. Officer Omand and/or defendant Hampton immediately requested emergency medical attention. (Pltf. Decl. at ¶ 67; Pltf. Exh. at 103-05.) Emergency clinic notes commence at 5:45 p.m; plaintiff complained, inter alia, of dizziness and he appeared to be off balance. (Pltf. Exh. at 106-09.)

55. Plaintiff states that, "[a]fter being rushed to the C-Facility emergency clinic, defendant Winton then administered my pain medications [Percocet]. However, at this time I became aware of the fact that the medication order for the Percocet pain medication was changed because defendant Winton only gave me one, then refused my request for another due to the fact, as he stated, the medication order by defendant Bal was for one (1) tab only. I informed Winton at the time the order was not correct/contrary to the orders of the UCD Davis medical staff." (Pltf. Decl. at ¶ 68; Pltf. Exh. at 119.)

56. Plaintiff states that "[d]uring the emergency visit RN Nicholson suggested that my pain prescription for MS Contin was possibly the cause for my symptoms of dizziness," as well as dehydration. (Pltf. Decl. at ¶ 69; Pltf. Exh. at 119; Pltf. SDF ¶ 52.) Plaintiff stated that his last dosage for MS Contin had been given at 3:00 a.m., when plaintiff was still at UCD. (Pltf. Exh. at

119.) At 7:15-7:45 p.m., Dr. Bal, via telephone, ordered that plaintiff be provided fluids, and that his prescription for MS Contin be discontinued. At 8:45 p.m., plaintiff became argumentative about the reduction in his pain medication. After trying to explain about the suspected side effects to his medications, RN Nicholson called Dr. Bal, who reinstated plaintiff's prescription for MS Contin, 30 mg, at 1 tab every 12 hours, provided he moved to the Outpatient Housing Unit (OHU). Plaintiff also retained his prescription for Percocet.

57. At 9:15 p.m., on March 6, 2007, plaintiff was transferred to the (OHU), where he was admitted at 10:30 p.m., and remained for two days. Plaintiff states that, while he was in the OHU, he spoke with Dr. Bal about the reduction in his pain medication. Dr. Bal reportedly stated that the prison had not timely received the UCD pharmacist's recommendations, but he nonetheless believed that plaintiff's current pain medications were adequate to provide relief. (Pltf. Decl. at ¶ 70; see also Cmplt. at ¶ 38; Pltf. SDF ¶ 54).

58. Plaintiff was discharged to C-Facility on March 8, 2007, at 9:50 a.m.

59. Plaintiff states that, on March 8, 2007, he did not receive Percocet "in the afternoon [at noon] and evening." (Pltf. Decl. at ¶ 71; Pltf. Exh. at 119.) Plaintiff states that he brought this to the attention of defendant Forshay "who blatantly disregarded my request. . . ." (Pltf. Decl. at ¶ 71.) Plaintiff adds that, "[t]hereafter, I received the Percocet, though not the prescribed dosage as recommended by UC Davis. As a result I often remained in agony." (Id. at ¶ 72.)

60. Plaintiff states that, on March 9, 2007, he did not receive MS Contin, which he "brought to the attention of the medical staff to no avail. As a result I often remained in agony." (Id. at ¶ 73.) Plaintiff stated that he instead received two 50 mg Tramadol, which had been prescribed by Dr. Wedell prior to plaintiff's surgery, and was ineffective in reducing plaintiff's post-surgical pain. (Pltf. Exh. at 119.)

61. On March 11, 2007, plaintiff submitted a sick-call slip (which he states he misdated as March 12, 2007), requesting a continuation of his pain medications, which were due to conclude on March 12. (Id. at ¶ 74; Pltf. Exh. at 114, 119.) Plaintiff states that his request was submitted to defendant Forshay, who allegedly told plaintiff he should not be experiencing that much pain, and allegedly refused to call a doctor. (Pltf. Decl. at ¶ 74.) Nevertheless, plaintiff

states that, on March 12, 2007, at noon, and then again in the afternoon, Medical Technical Assistant (MTA) Spinks gave plaintiff a "debridged" dose of pain medication, apparently pending his appointment with a physician. (Pltf. Decl. at ¶ 75; Pltf. Exh. at 119.) Plaintiff states that he received one 50 mg Tramadol tablet on March 13, 2007, when he informed MTA Spinks that "the prior evening I did not receive pain medications and was currently experiencing severe pain." (Pltf. Decl. at ¶ 76.) Spinks allegedly told plaintiff that, when she tried to speak with Dr. Wedell about plaintiff's need for pain medications, Dr. Wedell "refused to attend to my medical needs." (Id. at ¶¶ 76, 77.)

62. Plaintiff states that he received no pain medication on March 14 or 15, 2007, and submitted a sick-call slip. (Pltf. Exh. at 114-15, 119.) However, he states that, "[f]ortunately, I was seen at the ENT Clinic on March 16, 2007, and was prescribed pain medication Motrin." (Id. at ¶ 78.) In addition, it appears that plaintiff's prescription for Tramadol (50 mg), 1 tab three times a day, continued to be filled from March 16, through March 24, 2007. (Wedell Depo., Exh. 25.)

63. On March 16, 2007, plaintiff had his first post-operative follow-up appointment at UCD-ENT. Dr. Senchak found, upon examining plaintiff, that he was "doing well at postop three weeks. . . . For the patient's symptoms, I have given him a prescription for Motrin. We also encouraged continued use of saline irrigations inside the nose. We would like to see him back in three weeks for follow-up appointment." (Dfs. Exh. B at 228-29.)

64. Plaintiff alleges that, on March 18, 2007, defendant Forshay refused to provide plaintiff with sterile cleaning supplies for the self-care of his surgical incision. (Pltf. Decl. at ¶ 80.)

65. Plaintiff states that, on March 20, 2007, he was seen by Dr. Wedell, who reportedly told plaintiff that there had been no documentation supporting MTA Spinks' request that plaintiff have additional pain medication; plaintiff further alleges that Dr. Wedell conceded that "a biopsy is imperative to determine pathology." (Pltf. Decl. at ¶ 79.) In his progress notes, Dr. Wedell noted plaintiff's reported pain level, on March 20, 2007, at 4/10. (Pltf. Exh. at 116.) Dr. Wedell briefly recounted plaintiff's recent medical history, including that plaintiff had been seen at UCD

on March 16, 2007, and that CSP-SAC was awaiting the surgical report; plaintiff's nose was cultured, and he was directed to continue using the nasal sodium chloride; Dr. Wedell made a notation to follow-up after receiving plaintiff's surgical report from UCD. (Id.; Wedell Depo. at 46.)

66. Meanwhile, back on August 11, 2006, plaintiff submitted an administrative grievance (No. SAC-H-06-02090), complaining that Dr. Borges had requested plaintiff's referral to UCD-ENT in April 2006, to obtain the surgical removal of plaintiff's nasal polyp, but the referral had not yet been made; plaintiff requested an "immediate . . . out-patient specialist for the surgery." (Pltf. Exh. at 34-53.) On November 6, 2006, Dr. Borges issued the First Level Review decision, granting the appeal because plaintiff saw the UCD-ENT specialist on August 31, 2006. (Id. at 49.) On December 28, 2006, defendant Kelly, in her capacity as Health Care Manager (HCM), partially granted the appeal, on the further ground that plaintiff had a biopsy on December 1, 2006, and would obtain surgery "according to the schedule dictated by the ENT specialist." (Id. at 50-1.) On April 18, 2007, plaintiff's appeal was denied at the Director's Level, on the additional grounds that plaintiff had surgery on February 26, 2007, and a follow-up appointment on March 16, 2007, with a further follow-up appointment scheduled for April 20, 2007. (Id. at 52-3.)

67. On March 28, 2007, plaintiff submitted another administrative grievance (No. SAC-H-07-00851), challenging the quality and details of his medical care from March 6 through March 13, 2007. (Pltf. Decl. at ¶ 81; Pltf. Exh. at 117-29.) The grievance was partially granted at the First Level. While noting plaintiff's complaint that "the RN urged the physician to change his order for pain medications," plaintiff was reminded "that it was the physician who orders the medication and that the nursing staff must follow this order." (Pltf. Exh. at 125.) The grievance was partially granted at the Second Level, with the following findings (id. at 127):

> You were discharged from UC Davis Medical Center on March 6, 2007, following Ear, Nose, and Throat (ENT) Surgery. Our records show that Dr. Bal wrote the post-operative orders at 13:30 hours which included MS Contin-CR 30 mg po b.i.d., and Percocet one tablet possession (sic) t.i.d. for seven (7) days to control pain. In the evening of March 6, 2007, you became dizzy and after you were evaluated, you were transferred to Outpatient Housing Unit (OHU)

> for observation with the same level of pain medication. You were transferred back to C-Facility on March 8, 2007 after your status had been stabilized.

The grievance was denied at the Director's Level, with the findings, inter alia, that "inmates may not demand a particular medication, diagnostic evaluation, or course of treatment. . . . In this particular matter, the appellant's contention that he has not received adequate medical care is refuted by the medical records and professional staff familiar with the appellant's medical history." (Pltf. Exh. at 128-29.)

68. On April 20, 2007, at plaintiff's second post-operative follow-up appointment, plaintiff complained of "intermittent nasal blockage on the right side and he also has some concerns about the nature of the lesion, whether it is recurrent or not. There is no other history of any interval complaints or any other symptoms." (Dfs. Exh. B at 230.) Dr. Chopra examined plaintiff's nostrils with a flexible fiberoptic nasal endoscope. He found that plaintiff's nasal cavities were "healing well. There is no evidence of any residual disease. There is a minimal amount of crusting which is present in the posterior nasal cavity but there is no active discharge or bleeding or masses. The rest of the nasal examination is normal." (Id.) Dr. Chopra made the following assessment and plan (id.):

> Assessment: The patient is 1½ months postop a right lateral rhinotomy and medial maxillectomy for an inverted papilloma of the nasal cavity on the right side.
>
> Plan: The patient is to . . . come back in six weeks' time. He was counseled about nasal irrigations and he will continue to do that 4-5 times a day for his complaint of intermittent nasal blockage. Otherwise, he continues to do well. He is to follow with us earlier in case of any new complaints or any persistent nasal blockage or drainage from his nose.

69. On June 7, 2007, at plaintiff's third post-operative follow-up appointment, Dr. Chopra again examined plaintiff's nostrils with a flexible fiberoptic nasal endoscope. He found "a well-healing surgical cavity . . . on the right side with a mild amount of crusting present on the right lateral nasal wall. There were no findings suggestive of residual or recurrent tumors. Nasal patency is bilaterally positive. Examination of the left nasal cavity did not reveal any masses or ulcers." (Pltf. Exh. at 166.) Dr. Chopra made the following assessment and plan (id.):

> Assessment: The patient is now more than three months postop removal of inverted papilloma and continues to do well.
>
> Plan: The patient is to follow up with us for re-evaluation in three months' time or sooner in the case of any new or worsening complaints. At that time, he will be re-evaluated for any signs or symptoms suggestive of recurrent disease.

70. On September 21, 2007, plaintiff was transported to UCD-ENT for his fourth post-operative follow-up appointment. However, when he arrived at the ENT parking lot, the prison transportation officers were informed that plaintiff would not be seen that day due to a scheduling mix-up. Apparently, the appointment had previously been scheduled for August 21, 2007, but "was cancelled for reasons not explained." (Pltf. Decl. at ¶ 86.) Plaintiff avers that his Primary Care Physician failed to monitor plaintiff's ongoing care, and failed to inform plaintiff of the cancellation of his August 21, 2007 appointment, or properly schedule another appointment. The transportation officers reportedly told plaintiff that defendant Dunne would reschedule the appointment. (Id.) (As set forth below, plaintiff did not have his fourth post-operative follow-up appointment until January 24, 2008.)

71. On October 14, 2007, plaintiff submitted a sick-call slip which stated (Pltf. Exh. at 150):

> On Aug. 21, 2007, I was scheduled for a follow-up visit @ the UCD-ENT. That appointment was mistakenly thought to be Sept. 21. This info was discovered once I was taken to ENT. @ this point I was informed an appointment would be rescheduled. I request to confer with my medical staff to assure a rescheduling has been made.

72. On October 16, 2007, plaintiff was seen by RN Melegrito, who reportedly telephoned defendant Dunne and was informed that a follow-up appointment had not yet been made (Pltf. Decl. at ¶ 88; Pltf. Exh. at 150.)

73. On October 18, 2007, plaintiff was examined by Dr. Chen, who also reportedly telephoned defendant Dunne, and was informed that no arrangements had yet been made. (Pltf. Decl. at ¶ 89; Pltf. Exh. at 151.) Dr. Chen reportedly told defendant Dunne that the appointment was urgent. In addition, Dr. Chen completed a Physician RFS, backdated to October 10, 2007, wherein he requested an "urgent" follow-up appointment for plaintiff at UCD-ENT. (Pltf. Exh. at

152.) The request is marked "received" on October 22, 2007. Defendant Dunne approved the request on October 25, 2007. (Id.)

74. On November 16, 2007, plaintiff was again seen by Dr. Chen, who noted in pertinent part: "F/U ENT medical hold" (the medical hold was to defer plaintiff's anticipated transfer to CSP-Centinela). (Pltf. Exh. at 159, 162, 163.) Plaintiff states that Dr. Chen again telephoned defendant Dunne, who reportedly informed him that the follow-up appointment had still not been made. (Pltf. Decl. at ¶ 92.)

75. On December 18, 2007, plaintiff was seen by Dr. Wedell, whose treatment notes indicate that there had been a scheduling mix-up with plaintiff's follow-up appointment at UCD-ENT, and that plaintiff was still waiting for the appointment. Dr. Wedell called the Utilization Management desk, and left a message requesting that the follow-up appointment be rescheduled, and that the desk return Dr. Wedell's call. (Pltf. Exh. at 177.)

76. On January 24, 2008, plaintiff had his fourth follow-up appointment at UCD-ENT. Dr. Chopra again examined plaintiff's nose with a flexible fiberoptic nasal endoscope, which revealed "no abnormalities including obstructions, tympanic membrane retractions or perforation." (Pltf. Exh. at 165.) There was "no evidence of any exophytic masses of polyps on anterior rhinoscopy" in plaintiff's nasal cavity, oral cavity or oropharynx. (Id.) Dr. Chopra concluded as follows (id.):

> The patient is presently doing well. He has no significant signs or symptoms. We can continue following him up on a three to four monthly basis, and he will present to us sooner in the case of any interval complaints, all of which were discussed with him at this visit. Continue to follow him regularly.

77. Meanwhile, on November 19, 2007, plaintiff submitted a third relevant administrative grievance (No. SAC-H-07-02642), wherein he stated that "the medical staff at CSP-Sacramento had mistakenly made arrangements for the post-op a month later [Sept. 21, 2007] than what the ENT had scheduled [Aug. 21, 2007]," and that the appointment still had not been scheduled. Plaintiff requested that the appointment be made on an urgent basis (as requested by Dr. Chen), and that "the necessary steps be taken to prevent such medical delay of treatment in the future;" plaintiff also requested that "those responsible for the negligence . . . be held accountable. . . ."

(Pltf. Exh. at 160-61; see generally id. at 160-76.) The appeal was denied at the First Level, on January 7, 2008, with a note that plaintiff had an appointment scheduled in the "near future." (Pltf. Exh. at 161, 174.) On February 4, 2008, at the Second Level, defendant Bal, as CMO, "partially granted" the appeal, noting that plaintiff had the follow-up appointment on January 24, 2008. (Id. at 173-74.) The Director's Level Review decision denied the appeal, reasoning in pertinent part (id. at 168-69):

> In reaching a decision at the DLR, a review of the medical care provided to the appellant determined there was an unfortunate misunderstanding between the UCD specialty scheduling office and the SAC outpatient medical consult staff. As soon as the error was discovered the appellant was immediately rescheduled for follow-up with the UCD-ENT Clinic. According to the Inmate Medical Services Policy & Procedures (IMSP&P) Manual for high priority requests for services, the PCP shall follow the inmate-patient weekly until the appointment is accomplished. The weekly visit shall be documented on a CDCR Form 7409, 20-Day Specialty Consult Progress Note. In this particular matter, the appellant's contention that he was not afforded appropriate care is not supported by the medical records and professional health care staff familiar with his medical history. After review, there is no compelling evidence that warrants intervention at the DLR, as the appellant is receiving the health care services deemed medically necessary by his PCP, the Chief Medical Officer, and other member of the SAC medical staff.

V. Allegations and Claims Subsequent to the Filing Date of the Amended Complaint

In opposing the instant motion, plaintiff makes numerous factual allegations and legal claims concerning matters that occurred after the filing of the operative Amended Complaint, on December 7, 2007. (See Pltf. Decl. at pp. 34-51.) With the exception of plaintiff's allegations concerning the delay in his fourth post-operative appointment at UCD-ENT, on January 24, 2008, the court finds none of plaintiff's new allegations or claims cognizable in this action.[4]

---

[4] The undersigned denied plaintiff's October 13, 2010 motion (ECF No. 84), for leave to file a Second Amended Complaint (SAC). The court noted that plaintiff's proposed SAC sought to add twenty-five named defendants, include six defendants previously screened out from this action, and more than two hundred "Doe" defendants. Given the impracticable scope of the proposed SAC, and the imminent deadline for filing dispositive motions pertinent to the Amended Complaint, the court denied the motion, finding that "[t]o allow further amendment at this juncture would cause undue delay and prejudice to defendants." (ECF No. 93 at 7-8.)

The court finds that none of plaintiff's new allegations against defendants in this action state a cognizable claim.[5]

Plaintiff also seeks to introduce new defendants and new legal claims. Plaintiff alleges new Eighth Amendment claims against various CSP-SAC medical staff, from 2007 through 2010; and a First Amendment denial of access claim against CSP-SAC Senior Librarian A. Nappim, "during the course of my litigating both the instant matter and criminal matters." (Pltf. Decl. at ¶ 130.) However, plaintiff has two other cases currently pending in this court which, together, appear to encompass most of plaintiff's new allegations.

In Kilgore v. Grannis et al., Case No. 2:11-cv-01745 TLN DAD P, plaintiff asserts deliberate indifference to his serious medical needs following his February 26, 2007 surgery, including the need for a second surgery on October 1, 2009. The initial complaint, 442 pages in

---

[5] Plaintiff makes the following new allegations against defendants Bal, Wedell and Dunne (ECF No. 147-1):

Dr. Bal:
(1) On February 4, 2008, Dr. Bal, in his capacity as Health Care Manager (HCM), partially granted plaintiff's administrative grievance, submitted November 19, 2007 (challenging the failure to timely schedule plaintiff's fourth post-operative follow-up appointment), at the Second Level, but "failed to take the 'appropriate action requested' to prevent future delays in my on-going follow-up treatment at the ENT Clinic." (Pltf. Decl. at ¶ 97.)

(2) Dr. Bal, as HCM, partially granted plaintiff's administrative grievance submitted April 8, 2009 (alleging the denial of a medical device for cleansing plaintiff's sinuses), at the Second Level, but it was denied at the Director's Level. (Id. at ¶ 111.)

Dr. Wedell:
(1) On June 19, 2008, Dr. Wedell signed off on medications prescribed by Dr. Chopra, despite "knowing that the medication[s] . . . were ineffective given my medical history," and then "failed to [timely] submit the necessary paperwork approving Dr. Chopra's recommendation for the CT scan." (Pltf. Decl. at ¶ 101.)

UM Nurse Dunne:
(1) On May 18, 2008, plaintiff submitted an "Inmate Request for Interview" to Dunne, requesting that arrangements be made "for yet another past due ENT follow-up appointment as Dr. Chopra requested in January 2008." Dunne replied on May 30, 2008, that plaintiff's ENT appointment was scheduled for the "near future." (Pltf. Decl. at ¶ 99.)

(2) On August 12, and 13, 2008, Dunne reportedly informed RN John and a prison physician that no arrangements had yet been made for plaintiff's next CT scan. (Pltf. Decl. at ¶¶ 105, 106.)

length, "identified more than fifty doctors, nurses medical residents, and prison officials as defendants." (Id., ECF No. 5 at 3.) The operative Amended Complaint named twenty-three defendants; however, the court ordered service of process (which is currently proceeding) on only seven defendants, Riggs, O'Koroike, Mwai, Auer, Molina, King and Freitas, based on their alleged failure to adequately treat plaintiff's pain when he was placed in CSP-SAC's OHU in 2010, following his March 15, 2010 surgery. (Id., ECF No. 17.) Dr. Wedell, Dr. Bal, and UM Nurse Dunne, defendants in the instant action, were dismissed from Kilgore v. Grannis, pursuant to the court's finding that plaintiff had stated no cognizable cause of action against them, based on events following plaintiff's February 26, 2007 surgery. (Id.)

In Kilgore v. Virga et al., Case No. 2:11-cv-01822 WBS KJN P, plaintiff asserts that defendants Nappim, Hamad and Johnson interfered with plaintiff's right to access the courts. On October 16, 2013, the undersigned issued findings and recommendations recommending that plaintiff's Second Amended Complaint be dismissed without leave to amend, for failure to state a cognizable claim. (Id., ECF No. 43.) As of this writing, those findings and recommendations remain pending for the district judge's review.

Review of these cases demonstrates that plaintiff is elsewhere pursuing his legal claims concerning matters that occurred after he filed the Amended Complaint in the instant action. Nevertheless, to provide a more complete picture of plaintiff's medical challenges, the court sets forth plaintiff's additional factual allegations concerning his ongoing nasal condition and treatments.

In a further follow-up visit with UCD's Dr. Chopra, on June 19, 2008, it was recommended that plaintiff obtain another CT scan. Dr. Chopra informed CSP-SAC that he had ordered the scan "to monitor for recurrence of disease," and would "see him back after the CT scan." (Pltf. Exh. at 187.) The request was made by UCD on June 24, 2008; Dr. Menon submitted a RFS on the same date; UM Nurse Dunne approved the request on June 26, 2008. (Id. at 192.) The CT scan was conducted on August 28, 2008. (Id. at 197-98.) A "small polypoid lesion" was identified that could "represent mucosal thickening" or "residual mass," and it was determined that a "contrast-enhanced CT or MR may be helpful in evaluation, if indicated." (Id.

at 197.)

On January 2, 2009, plaintiff was again examined at UCD-ENT, for "routine postoperative surveillance," and was found to be "doing fairly well." (Id. at 199.) "No changes were noted in the small polypoid lesions, which appear to be redundant mucous in the posterior medial maxillary wall." (Id.) It was suggested that plaintiff return in three months for a "repeat examination . . . to watch for any recurrence of the lesions." (Id.)

"On April 14, 2009, [plaintiff] suffered a broken nose after falling into a windowpane and was rushed to the U.C. Davis Emergency Dept." (Pltf. Decl. at ¶ 112.) Thereafter, a CT scan was conducted and revealed "residual thickening of the soft tissues which may represent . . . recurrence of inverted papilloma." (Pltf. Exh. at 214.) It was recommended that plaintiff have a follow-up at the ENT Clinic within the next week.

On April 24, 2009, plaintiff was seen at UCD-ENT. Dr. Aminpour noted that plaintiff had a "chronic nasal deformity," including a septum that was "quite deformed" and "tortuous;" that plaintiff had a nasal bone fracture; and that plaintiff reported nasal obstruction, more on the left than the right. (Pltf. Exh. at 250.) Dr. Aminpour recommended that plaintiff "followup in three months once the bones have had a good chance to heal. He will subsequently undergo a septorhinoplasty with possible turbinectomy." (Id.; see also Pltf. Decl. at ¶ 113.)

Plaintiff was not seen again at UCD-ENT until September 23, 2009. He had a preoperative visit on October 1, 2009, and second surgery on October 7, 2009. Two masses, later identified as inverted papilloma, were removed from plaintiff's right nostril. The postoperative diagnosis was: "(1) Chronic nasal deformity; (2) Deviated septum; and (3) Right nasal mass biopsied." (Pltf. Exh. at 241; Pltf. Decl. at 116-17.) Additional follow-up was recommended.

At a follow-up examination at UCD-ENT on November 3, 2009, Dr. Aouad recommended that plaintiff have a further diagnostic CT scan with contrast to "better assess the deep extension of this tumor." (Pltf. Exh. at 239.)

A CT scan was conducted on January 25, 2010. Dr. Aouad discussed the results with plaintiff on February 25, 2010. (Pltf. Exh. at 235-36.) "The CT revealed a soft tissue mass involving the anterior medial portion of the right maxillary antrum along the course of the right

nasolacrimal duct." (Id. at 235.) Dr. Aouad noted that recurrence rates for inverted papilloma are between 8% to 12%. (Id. at 236.)

Plaintiff had a third surgery on March 15, 2010, described as an "[o]pen medial maxillectomy via lateral rhinotomy approach, drill-out of right maxillary sinus, placement of Guibor stent." (Pltf. Exh. at 225-26.) The anterior maxillary wall and right maxillary mucosa were removed entirely. Both the preoperative and postoperative diagnoses were "recurrent inverted papilloma of the right maxillary sinus." (Id.)

Plaintiff was returned to the CSP-SAC OHU the following day, on March 16, 2010. As earlier noted, plaintiff is currently challenging the quality of his medical care during that OHU placement, in Kilgore v. Grannis et al., Case No. 2:11-cv-01745 TLN DAD P.

VI. Discussion

It is undisputed, at all times relevant to this action, that plaintiff's nasal polyp (inverted papilloma) and related symptoms, including plaintiff's need for adequate pain medications after his biopsy and surgery, were "serious medical needs" within the meaning of the Eighth Amendment. See McGuckin, 974 F.2d at 1059-60. At issue is whether any defendant was deliberately indifferent to plaintiff's serious medical needs, for the period December 30, 2005 (when plaintiff's nasal polyp was discovered), through January 24, 2008 (when plaintiff had his last relevant post-operative appointment). [6]

---

[6] The following is a summary of the significant dates in this action:

December 30, 2005: Dr. Wedell first diagnosed plaintiff's nasal polyp.
February 21, 2006: Dr. Borges conducted his first examination of plaintiff's nasal polyp.
April 17, 2006: Dr. Borges submitted a "routine" RFS referring plaintiff to UCD-ENT.
August 9, 2006: Dr. Duc redesignated Dr. Borges' RFS as "urgent," and resubmitted it.
August 31, 2006: Plaintiff's first appointment at UCD-ENT.
September 14, 2006: Dr. Bal treated plaintiff for the first time.
October 25, 2006: CT scan at UCD-ENT.
November 29, 2006: Operative biopsy at UCD-ENT.
February 26, 2007: Surgery at UCD-ENT, and hospitalization at UCD Medical Clinic.
March 6, 2007: Plaintiff returned to CSP-SAC, first to the TTA; then to the general population; then to the Emergency Clinic; then to the OHU.
March 8, 2007: Plaintiff released from OHU to Facility C general population.
March 16, 2007: First post-operative appointment at UCD-ENT.
April 20, 2007: Second post-operative appointment at UCD-ENT.

A. <u>Alleged Deliberate Indifference Prior to April 17, 2006</u>

Plaintiff initially contends that, from December 30, 2005, until April 17, 2006, when plaintiff was first referred to UCD-ENT, defendant physicians Dr. Wedell and Dr. Borges were deliberately indifferent to plaintiff's serious medical needs by continuing to prescribe medications that they allegedly knew were ineffective. Plaintiff also contends that this treatment reflected a policy allegedly imposed by defendant HCM Kelly, that required physicians to exhaust conservative medical treatments before referring a prisoner for outside medical care.

Dr. Wedell was the first physician to diagnose plaintiff's polyp, on December 30, 2005, using an anterior rhinoscopy. He immediately prescribed Benadryl and Nasarel. Dr. Wedell did not see plaintiff again until October 2006, but renewed his prescription for Benadryl on January 17, 2006, January 25, 2006, and February 3, 2006.

On February 6, 2006, Dr. Borges renewed plaintiff's prescription for Nasarel (Flunisolide), and added a prescription for Actifed (Sudafed). Dr. Borges saw plaintiff for the first time on February 21, 2006, and reportedly insisted that plaintiff continue taking his sinus medications until his next visit. Two weeks later, on March 6, 2006, Dr. Borges added a prescription for Claritin, while continuing Nasarel and Actifed, and asked plaintiff to return in 6 to 8 weeks. Six weeks later, when Dr. Borges examined plaintiff on April 17, 2006, he submitted the referral to UCD-ENT.

Dr. Wedell and Dr. Borges each testified, at their respective depositions, that the medications they prescribed plaintiff during this period reflected the standard first-line medical treatment for allergic rhinitis and associated nasal polyps. Plaintiff has presented no evidence to the contrary.

Dr. Wedell testified that a nasal polyp is "not an uncommon finding in people who have allergic disease." (Wedell Depo. at 8-9.) He explained that "a polyp is a swelling, a localized swelling in the nostrils. It can be seen for a variety of reasons, but it's commonly seen with people who have allergic disease[.]" Dr. Wedell testified that the medications Benadryl (an

---

June 7, 2007: Third post-operative appointment at UCD-ENT.
January 24, 2008: Fourth post-operative appointment at UCD-ENT.

antihistamine) and Nasalide (a nasal topical steroid), are "pretty thorough medications for allergic rhinitis."[7] (Id. at 9-11, 13.)

Dr. Borges described allergic rhinitis as "[s]inus congestion, runny nose, pressure. It could also be described as congestion in your nostrils, even to the point of, you know, having obstructive symptoms." (Borges Depo. at 14-5.) He testified that he added Claritin in March (and inferred that he added Actifed in February), because plaintiff was "still having symptoms," and so Dr. Borges wanted to try adding a "different class" of medication. (Id. at 11-7; Exhs. 3-5.) Six weeks after adding Claritin, when plaintiff's symptoms had not subsided, Dr. Borges submitted the referral to UCD-ENT.

Plaintiff characterizes this period as an unconstitutional "delay" in receiving treatment. However, plaintiff simply disagrees with the conservative treatment provided him before his April 17, 2006 referral. Although plaintiff's treatment during this period did not resolve his symptoms, he has presented no evidence indicating that the treatment was medically inappropriate. Both Dr. Wedell and Dr. Borges diagnosed allergic rhinitis, and prescribed medications that reasonably could have reduced plaintiff's symptoms, including shrinking his nasal polyp. It was reasonable for both physicians to exhaust this conservative treatment option before referring plaintiff to UCD-ENT. A difference of opinion between a prisoner and his physicians concerning appropriate treatment does not support a deliberate indifference claim. Snow, 681 F.3d at 987; Jackson, 90 F.3d at 332.

Moreover, the court does not find any evidence to support plaintiff's contention that Dr. Kelly, who served as Acting HCM at CSP-SAC from January 2006 until May 2007, implemented or enforced an institutional policy[8] that was the "moving force" behind the decisions of Dr.

---

[7] Dr. Wedell also stated that patients "often go to the ear, nose and throat doctors and have their polyps shaved when that have some trouble breathing. It doesn't cure them, but it temporarily provides a benefit." (Id. at 12.)

[8] "Supervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'" Thompkins v. Belt, 828 F.2d 298, 304 (5th Cir. 1987) (quoted with approval in Hansen v. Black, 885 F.2d 642, 646 (9th Cir.1989).

Wedell and Dr. Borges to conservatively treat plaintiff before referring him to UCD-ENT. As plaintiff notes, CDCR's Inmate Medical Services Policies & Procedures (IMSPP), Chapter 8 (Specialty Services), authorizes a prisoner's PCP to order outside specialty health care services when "medically necessary." (IMSPP, Chap. 8, Sec. II (May 2009).) However, this reasonable requirement is to be determined by a prisoner's treating physician on an individual basis, not by the HCM or pursuant to CDCR policy. Moreover, Dr. Kelly emphasized that "the position of Health Care Manager is administrative in nature," without responsibility for medical policy.[9] (Kelly's Responses to Plaintiff's Interrogatory Nos. 20, 30 (Set Two).) She also clarified, "I am not a medical doctor, and would not have been responsible for evaluating the diagnosis and treatment provided by either Dr. Wedell or Dr. Borges." (Kelly's Response to Plaintiff's Interrogatory No. 20 (Set Two); see also Kelly's Amended Response to Plaintiff's Interrogatories 15-8.)

The court finds no evidence to support plaintiff's contention that Dr. Kelly was responsible for an institutional policy that limited physician treatment options. Rather, the record demonstrates that plaintiff received constitutionally adequate medical care during the period December 30, 2005, to April 17, 2006. Therefore, defendants Wedell, Borges, and Kelly are each entitled to summary judgment on plaintiff's deliberate indifference claims during this period.

B. Alleged Deliberate Indifference Designating April 17, 2006 Referral as "Routine"

Plaintiff contends that Dr. Borges was deliberately indifferent to his serious medical needs when he designated plaintiff's April 17, 2006 referral to UCD-ENT as "routine" rather than "urgent." "Routine" specialty consultations and procedures are to be provided within 90 days after ordered by the prisoner's PCP, while "urgent" matters are to be provided within 14 days. (IMSPP, Chap. 8, Sec. III.A.2 (May 2009).)

////

////

---

9 Consistently, Dr. Bal, who served as HCM from May 2007 through May 2009, stated that "the duties of the Health Care Manager were administrative only." (Bal's Response to Plaintiff's Interrogatory No. 22 (Set Two).)

Dr. Borges' decision[10] to designate this referral as "routine" reflected his medical judgment at that time. Plaintiff relies on Dr. Duc's subsequent redesignation of the referral as "urgent" to support his argument that Dr. Borges erred in designating it "routine." However, Dr. Duc redesignated the referral on August 9, 2006, nearly four months after it was submitted by Dr. Borges. The requested consultation was then outside the 90-day limit established by the IMSPP.[11] Additionally, Dr. Duc observed that plaintiff's polyp now appeared to be "obstructing totally" his right nostril. (Dfs. Exh. B at 97.) These subsequent factors were not part of Dr. Borges's medical judgment on April 17, 2006. Moreover, as noted below, when Dr. Duc learned that plaintiff's consultation was soon scheduled for August 31, 2006, he was reportedly "fine" with it.

Plaintiff's disagreement with Dr. Borges' decision to designate plaintiff's initial, April 17, 2006, referral to UCD-ENT as "routine," amounts to no more than a difference of opinion between plaintiff and Dr. Borges. As earlier noted, a difference of opinion between a plaintiff and one of his physicians concerning appropriate medical care fails to support an Eighth Amendment claim. Snow, 681 F.3d at 987.

C. Alleged Deliberate Indifference from April 17, 2006, until August 31, 2006

Plaintiff next contends that, after defendant Borges submitted the April 17, 2006 referral, defendants Borges, Dunne and Kelly were each deliberately indifferent to plaintiff's serious

[10] Dr. Borges testified that he believed this referral went through the Medical Authorization Review (MAR) Committee, which agreed that the "routine" designation was appropriate, and then the referral was routed to the UM Nurse for scheduling. (Borges Depo. at 21.) However, defendant Dunne, the UM Nurse, testified that she was authorized to approve (but not deny) a Physician RFS if the requested procedure was listed in the Medical Service Index of diagnostic codes; if the requested procedure was not listed, then the RFS was referred to the MAR Committee. (Dunne Depo. at 7-8.) Dunne testified that she received Dr. Borges' April 17, 2006 RFS for plaintiff on April 20, 2006, and approved it on May 9, 2006. (Id. at 9-14.)

[11] The court notes that this 90-day limit is an institutional goal; if the limit is exceeded, the HCM, upon notification, is generally directed to "identify whether there is a pattern of delay in a specific specialty area and shall forward the matter to the Quality Management Committee for an evaluation and recommendation." (IMSPP, Chap. 8, Sec. III.C.5 (May 2009).) Whether exceeding the deadline adversely impacts an individual prisoner's medical care is a matter to be determined on a case-by-case basis, pursuant to the standards for assessing deliberate indifference.

medical needs by failing to ensure the timely scheduling of plaintiff's initial consultation, which finally took place on August 31, 2006 (136 days later). However, the record fails to support any inference that the delay in securing plaintiff's initial appointment at UCD-ENT was attributable to deliberate indifference by Dr. Borges, UM Nurse Dunne or HCM Kelly, or that plaintiff's medical care during this period was deliberately indifferent.

UM Nurse Dunne testified that a Physician RFS is routinely submitted to the UM Nurse, who processes it and, if she approves it, gives it to the scheduler to work with the outside specialty provider to set an appointment. Significantly, Dunne testified that, once a referral is made to UCD, the scheduling of appointments and procedures is within UCD's discretion. Dunne testified, "UC Davis is not employed by the state so we are . . . at their mercy for appointment times." (Dunne Depo. at 16-7; see also id. at 19 (appointments dictated by the specialty provider).) Dunne explained that seven prisons refer prisoners to UCD, and that CSP-SAC alone may send as many as 130 prisoners a week to UCD. (Id. at 18, 26.)

Dunne testified that she received Dr. Borges' April 17, 2006 RFS for plaintiff on April 20, 2006, approved it on May 9, 2006, and then gave it to the schedulers, who were responsible for contacting UCD-ENT. Dunne testified that "UC Davis was our place for ENT," and that "I had a scheduler who scheduled almost exclusively for UC Davis because we used them heavily." (Id. at 8-12; Exh. 1.) After Dunne gave the form to the scheduler, she had no further interaction with the form or the referring doctor, unless another referral was required, which needed to be requested in a new RFS. (Id. at 13.)

Dunne testified that she recalled Dr. Duc's August 10, 2006 redesignation of plaintiff's referral from routine to urgent, and recalled "talking to Dr. Duc about this that we already had this appointment." (Id. at 22; Exh. 2.) Dunne recalled that a scheduler was unsuccessful in attempting to move up plaintiff's August 31, 2006 appointment, and Dunne explained this to Dr. Duc, who "was fine with it." (Id. at 33; see also id. at 19-33, 39-44.)

Consistently, Dr. Borges testified (Borges Depo. at 23):

> I don't schedule. What happens is the UM Nurse then gets involved in the scheduling process where we have different contracts with different facilities, some of them are more impacted

> than others, and because of limited specialists, it may just be one facility, so the UM Nurse then tries to arrange, expedite an appointment with that specific contracted facility. The doctor does not call or arrange appointments.

Further, HCM Kelly testified that she had no responsibility for reviewing or approving a Physician RFS. Dr. Kelly did not recall seeing Dr. Borges' April 17, 2006 referral, and this is a matter that she would not normally review. (Kelly Depo. at 10.) Similarly, Dr. Kelly did not recall seeing plaintiff's August 1, 2006 Request for Interview, directed to Dr. Kelly, in which plaintiff complained that his nasal polyp was "ever-increasing" in size as he waited for his April 17, 2006 referral to UCD-ENT. (Id. at 8-9; Exh. 1.) Dr. Kelly testified that, had she seen the Request, she would have referred it to the CMO (whose identity is not apparent from the record),[12] or the prisoner's treating physician (however, plaintiff's August request was made between Dr. Borges' July 2006 departure and Dr. Bal's assumption of plaintiff's care in September 2006).[13]

For these reasons, the court finds no evidence to support plaintiff's contention that Dr. Borges, UM Nurse Dunne, or HCM Kelly were responsible for the delay in scheduling plaintiff's initial UCD-ENT consultation. Rather, it is apparent that UCD-ENT scheduled plaintiff's initial consultation, and did so beyond CDCR's 90-day limit. There is no substance to plaintiff's further

---

[12] Dr. Kelly opined that the CMO at the time may have been Dr. Bal (Kelly Depo. at 9), but Dr. Bal stated that he became CMO in May 2007 (Bal Response to Plaintiff's Interrogatory No. 21 (Set Two)).

[13] Dr. Kelly did recall addressing two of plaintiff's other matters, both in December 2006. Kelly testified that she routinely signed papers authorizing a prisoner's transport to specialty medical care appointments, and acknowledged that she approved the transportation for plaintiff's December 8, 2006 appointment at UCD-ENT. (Kelly Depo. at 10-13; Exh. 5.)

Dr. Kelly also acknowledged that she signed the December 28, 2006 Second Level Response to plaintiff's August 11, 2006 administrative grievance (No. SAC-H-06-02090). The grievance was initially reviewed by Dr. Duc on behalf of Dr. Kelly. Dr. Kelly stated that, in reviewing this grievance, she first learned of plaintiff's complaints concerning the delay in his initial referral to UCD-ENT. However, by then, plaintiff had already had his first consultation, as well as his surgical biopsy; because plaintiff was already under UCD's care, Dr. Kelly partially granted plaintiff's grievance at the Second Level, and did not further pursue the matter. (Kelly Depo. at 14-8; Exh. 11.)

argument that the delay in scheduling was due to CSP-SAC's policy of faxing their referrals to outside providers.

Moreover, it is clear that plaintiff received regular and appropriate medical care pending his initial UCD-ENT consultation. After making the referral, Dr. Borges, as plaintiff's referring PCP, was responsible for seeing plaintiff on a regular basis, "as clinically indicated and determined necessary by the PCP." (IMSPP, Chap. 8, Sec. III.C.2, II.C.4 (May 2009).) These appointments were generally recorded on "Thirty (30)-Day Specialty Consult Progress Notes." As required, Dr. Borges thereafter saw and actively treated plaintiff at thirty-day intervals, on May 19, 2006, and June 20, 2006, [14] until Dr. Borges was rotated out of C Facility Clinic approximately July 2006. (Borges Depo. at 30.) Plaintiff's next interval appointment was on July 14, 2006, with an unidentified physician, who found plaintiff's condition "stable," advised plaintiff to continue taking his nasal steroids, and opined that plaintiff's consultation at UCD-ENT, reportedly scheduled during the first two weeks of August, was "clinically appropriate." Finally, on August 9, 2006, apparently in response to plaintiff's July 26, 2006 sick-call slip, submitted plaintiff was seen by Dr. Duc, who sought to expedite plaintiff's referral, and was informed that it was scheduled for August 31, 2006. (Dfs. Exh. B at 24, 97; Dunne Decl. at ¶ 17.)

As with plaintiff's medical care prior to April 17, 2006, plaintiff's subsequent medical care, until August 31, 2006, remained conservative and reliant on prescribed nasal medications, but nevertheless consistent. The court finds that plaintiff received constitutionally adequate medical care during this period, including from Dr. Borges.

---

[14] On the April 17, 2006, Dr. Borges renewed plaintiff's prescriptions for Claritin, Nasarel, and Actifed, and prescribed Ipratropium nasal spray, a non-formulary request that required further approval. (Borges Depo. at 18-21; Exhs. 8-11, 13.) Dr. Borges renewed plaintiff's prescriptions for Actifed, Nasarel and Benadryl on May 9, 2006. (Id. at 25; Exh. 14.) At plaintiff's thirty-day follow-up appointment, on May 19, 2006, Dr. Borges added a prescription for Prednisone, 40 mg, 1 tab every day for 10 days, then 20 mg, 1 tab every day for 30 days. (Id. at 26-7; Exhs. 15-6.) However, on May 26, 2006, Dr. Borges discontinued the Prednisone, due to plaintiff's apparent allergic reaction, and again prescribed Benadryl. (Id.; Exh. 17.) At plaintiff's next thirty-day appointment, on June 20, 2006, Dr. Borges examined plaintiff's right knee for complaints of a sprain two weeks prior, secondary to jogging. In addition to ordering knee x-rays, recommending range-of-motion exercises, and providing an Ace bandage, Dr. Borges noted plaintiff's ongoing allergic rhinitis, and that his ENT appointment was pending; Dr. Borges encouraged plaintiff to return to the clinic as needed. (Id. at 28-9; Exh. 18.)

For these several reasons, summary judgment should be granted for defendants Borges, Dunne and Kelly on plaintiff's deliberate indifference claims for the period April 17, 2006, to August 31, 2006.

D. Alleged Deliberate Indifference in Scheduling CT Scan, Biopsy and Surgery

Plaintiff next contends that the expert care he received from UCD-ENT specialists was routinely delayed, resulting in a worsening of his symptoms. Plaintiff asserts that UM Nurse Dunne, together with plaintiff's new treating physician, Dr. Bal, were deliberately indifferent in failing to expedite the scheduling of plaintiff's CTC scan, biopsy and surgery.

1. Scheduling of October 25, 2006 CT Scan

After plaintiff's initial consultation, on August 31, 2006,UCD-ENT specialist Dr. Doctor recommended, without a time frame, that plaintiff have a CT scan. Dr. Doctor's letter was received by CSP-SAC on September 20, 2006. (Dfs. Exh. at 204.) In the meantime, Dr. Bal saw plaintiff for the first time on September 14, 2006. His treatment notes indicate that plaintiff's nasal polyp was "obliterating" plaintiff's right nostril but not protruding out, and that Dr. Bal intended to follow the UCD-ENT recommendations. Dr. Bal noted that the reason for the polyp growth needed be ascertained, and that this may require an MRI or biopsy. Dr. Bal explained at his deposition that "nasal polyps are . . . very tricky. It's a very common condition, especially in areas with high predominance of allergies. So a lot of times these could be inflammatory, a lot of times these are benign growths, a lot of times it could be something else which could be bigger." (Bal Depo. at 10-5; Exh. 4.)

Thereafter, on September 22, 2006, within two days of CSP-SAC's receipt of Dr. Doctor's letter, Dr. Bal submitted a Physician RFS for the recommended CT scan, also without a time frame (Dfs. Exh. B at 27); he called the consult desk on September 26, 2006, to ascertain the status of the scheduling (id. at 98.) UM Nurse Dunne testified that she treated the request as "routine" because it lacked a time frame. (Dunne Depo. at 34-5.) Dunne approved the request on October 3, 2006 (Dfs. Exh. B at 27), and the CT scan was conducted on October 25, 2006.

The court finds that the scheduling of plaintiff's CT scan was not unduly delayed. Despite the lack of a requested time frame, by Dr. Doctor or Dr. Bal, the CT scan was conducted less than

two months after UCD-ENT deemed it necessary, and little more than a month after CSP-SAC was so informed. The CT scan was conducted well within 90-day limit for obtaining routine specialty procedures. Therefore, the scheduling of plaintiff's CT scan fails to support plaintiff's claim of deliberate indifference.

2. Scheduling of November 29, 2006 Biopsy

The CT report was received at CSP-SAC on October 31, 2006. Because the findings indicated that the mass could be malignant, Dr. Bal acted quickly. The same day, Dr. Bal telephoned defendant Dunne and asked her write out and submit a Physician RFS, requesting an "urgent" follow-up appointment for plaintiff at UCD-ENT. (Dfs. Exh. B at 33; Pltf. Exh. at 63; Bal Depo 19-25; Dunne Depo. at 38-9.) Defendant UM Nurse Dunne did so, and approved the request the same day, on October 31, 2006. (Id.)

Dr. Bal next saw plaintiff on November 22, 2006, and discussed with him at length the results of plaintiff's CT scan. Dr. Bal noted that he confirmed with the consult desk that plaintiff's next UCD-ENT appointment was scheduled "very soon."[15] (Bal Depo. at 27-9, and Exh. 8, 9.)

Meanwhile, on November 17, 2006, plaintiff was seen by defendant Dr. Wedell, pursuant to a "Thirty (30) Day Specialty Consult Progress Note." Although Dr. Wedell noted that plaintiff's condition had worsened, he determined that plaintiff's next appointment, a biopsy, was scheduled, and that the timing was "clinically appropriate." (Pltf. Exh. at 67; Pltf. Decl. at ¶ 46; see also Wedell Depo. at 21-4, and Exhs. 11, 12.)

On November 29, 2006, less than one month after CSP-SAC received the CT report on October 31, 2006, and further recommendation that plaintiff undergo an operative biopsy, the biopsy was conducted. Ideally, the procedure requested by Dr. Bal's October 31, 2006 "urgent" request would have been conducted within 14 days; however, as previously shown, the final scheduling of UCD procedures was within the discretion of UCD. Nevertheless, this scheduling

[15] Dr. Bal stated that he omitted the date from his treatment note pursuant to institutional policy that inmates not be told in advance the dates of their outside consultations. (Bal Depo. at 27-9, and Exh. 8, 9.)

sequence would be expeditious even outside the prison context. Accordingly, the court finds that the scheduling of plaintiff's biopsy was not unduly delayed, and hence fails to support plaintiff's deliberate indifference claim.

3. Scheduling of February 26, 2007 Surgery

On December 8, 2006, plaintiff met with UCD-ENT specialist Dr. Fuller to discuss his biopsy results. Plaintiff's nasal mass was not malignant, but was diagnosed as an inverted papilloma requiring surgical removal. Dr. Fuller informed CSP-SAC, in a report received on December 28, 2006, that plaintiff was in agreement with surgery, and that "a booking slip has been submitted and we are waiting an OR [operating room] date and preop date at this point in time. We will keep you advised of any additional appointments in regard to his upcoming surgery." (Dfs. Exh. B at 208).

On January 18, 2007, plaintiff was seen by FNP Blackwell who, on the same day and with the authorization of UCD-ENT specialist Dr. Fuller, submitted a Physician RFS, requesting an "urgent" outpatient referral to UCD-ENT for removal of plaintiff's "nasal/sinus mass." (Pltf. Exh. at 92-3.) The request was approved on January 23, 2007. (Id.) Plaintiff was transported to UCD-ENT on February 22, 2007, for his pre-op evaluation, and on February 26, 2007, underwent his surgery.

The record evidence supports the reasonable inference that UCD scheduled each of these dates in due course. Plaintiff would have the court believe that his surgery was unduly delayed by CSP-SAC, and would never have been scheduled without his advocacy. While the record is unclear whether the January 18, 2007 referral completed by FNP Blackwell was driven by her assertiveness, at plaintiff's urging, or triggered by a call from Dr. Fuller, UCD's independent and final decision-making authority cannot be underestimated. Moreover, the scheduling of plaintiff's surgery, within three months after plaintiff's biopsy (which demonstrated no malignancy), does not reflect undue delay.

"[M]ere delay of surgery, without more, is insufficient to state a claim of deliberate medical indifference[.]" Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985). To establish a claim of deliberate indifference arising from delay in providing

medical care, a plaintiff must demonstrate that the delay was harmful. See Berry v. Bunnell, 39 F.3d 1056, 1057 (9th Cir. 1994); McGuckin, 974 F.2d at 1059; Wood, 900 F.2d at 1335 (9th Cir. 1990). While the record demonstrates that plaintiff's nasal polyp continued to grow, there is no evidence demonstrating that this process significantly impacted the nature or extent of plaintiff's surgery, and thus that the wait for surgery caused plaintiff additional harm.

More specifically, plaintiff has failed to allege any facts from which to infer that Dr. Bal or UM Nurse Dunne could have expedited plaintiff's surgical date but failed to do so. Stated differently, plaintiff has failed to demonstrate that either defendant knew of and disregarded an excessive risk of serious harm to plaintiff based on the scheduling of his surgery. See Toguchi v. Chung, 391 F.3d 1051, 1057-58 (9th Cir. 2004) (a prison official is deliberately indifferent only if he knows of, and disregards, an excessive risk to plaintiff's health). For these reasons, the court finds that the scheduling of plaintiff's surgery fails to support plaintiff's deliberate indifference claims.

For the reasons set forth above, summary judgment should be granted for defendants Bal and Dunne on plaintiff's claims that they were deliberately indifferent to plaintiff's serious medical needs in the scheduling of plaintiff's specialized care (CT scan, biopsy and first surgery) at UCD.

E. Alleged Deliberate Indifference to Plaintiff's Pain Symptoms After His Biopsy

It is undisputed that plaintiff experienced pain while recovering from his November 29, 2006 biopsy, which included "aggressive debridement." Plaintiff contends that there were two significant gaps in the administration of his pain medication during this period. First, plaintiff contends that he was without pain medication and "in agony" for nearly 24 hours, when his Vicodin was discontinued on November 30, at approximately 11:00 pm ("between 10:50 p.m. and 11:10 p.m."), until he received his first dose of Percocet on December 1, at approximately 8 p.m. (Pltf. Decl. at ¶ 49.) Second, plaintiff contends that he received no Percocet at 8:00 a.m. or 12:00 p.m. the next day, December 2, 2006, because the prescribed dosage was "out of stock," rendering his pain "unbearable" until he received an alternate dosage of Percocet mid-afternoon. Plaintiff also contends that he had to wait two days to obtain the anti-inflammatory nasal spray

prescribed by UCD-ENT on December 1, 2006, after plaintiff's post-biopsy nasal packing was removed.

The record supports plaintiff's assertion that his Vicodin was discontinued at approximately 11:00 p.m., on November 30, 2006, due to plaintiff's apparently allergic reaction to it (a rash); it appears that plaintiff received his last dose of Vicodin at 8 p.m. that evening. (Pltf. Exh. at 73-4.) The record also supports plaintiff's assertion that, the next day, December 1, 2006, Dr. Bal examined plaintiff and prescribed Percocet (Oxycodone/APAP) (7.5/325, 1 tab every 6 hours for 7 days). (Id. at 74, 76). However, there is no record evidence to refute plaintiff's assertion that he failed to receive his first dose of Percocet until 8 p.m. on December 1, 2006. (Pltf. Decl. at ¶ 49.) Plaintiff's deposition of Dr. Bal did not address this apparent 24-hour gap in plaintiff's pain medication.[16] (See Bal Depo. at 30-4.)

The record also supports plaintiff's assertion that he received no Percocet at 8:00 a.m., or 12:00 p.m., on December 2, 2006 (Pltf. Exh. at 458), because it was "out of stock," supporting a reasonable inference that plaintiff's pain became "unbearable" by 3:00 p.m. that afternoon (Pltf. Decl. at 53). Dr. Bal testified that he does not recall being informed that plaintiff failed to receive his prescription for Percocet at 8 a.m. and noon on December 2, 2006, but that he would not necessarily have been so informed. (Bal Depo. at 33-4.)

At 3:20 p.m., on December 2, 2006, Dr. Wedell prescribed a different dosage of Percocet (Oxycodone/ APAP (5/325), 1 tab every 6 hours for 7 days) for plaintiff. (Pltf. Exh. at 75, 80.) While plaintiff asserts no significant pain allegations after this time, he does assert that Dr.

////

[16] Nevertheless, the court notes Dr. Bal's description of his December 1, 2006 appointment with plaintiff. Dr. Bal noted plaintiff's nasal packing and sutures, plaintiff's complaints of sore throat, right side headache, and constipation. Dr. Bal prescribed Percocet (7.5/325 mg, 1 tab every 6 hours, for 7 days), and Colace, and contacted the consult desk to confirm that plaintiff had a follow-up appointment with UCD-ENT. (Bal. Depo. at 30-3, and Exhs. 10,11.) Dr. Bal testified that "this was an important visit in my mind because now I know that he has already gone through CT, he has had a follow-up, he's had a biopsy. [¶] Because I was really tracking it very closely . . . within a month. 10/25 he had the CT done, 10/31 we wrote the RFS. . . . biopsy done on 11/29. So this was an important visit for me because I had just talked to him about his CT scan last time and he came back. . . after he had had the biopsy." (Id. at 32.)

Wedell prescribed a different dosage of Percocet than that ordered by UCD-ENT.[17]

While plaintiff has demonstrated that he experienced significant additional pain as a result of the gaps in receiving his prescription pain medications after his biopsy, he has failed to demonstrate that this harm was caused by the deliberate indifference of defendants Bal or Wedell. There is no evidence that either defendant knew of these omissions and ignored them with a conscious disregard of serious risk to plaintiff. See Farmer, 511 U.S. at 837 (prisoner must demonstrate that prison officials subjectively knew of and disregarded an excessive risk to the prisoner's health). In the present case, plaintiff was prescribed adequate pain medication (Vicodin) upon his return to CSP-SAC. That medication was discontinued, at 11 p.m. on November 30, 2006, only because plaintiff developed an allergic reaction to it. When Dr. Bal examined plaintiff the next day, he prescribed an alternative pain medication (Percocet). There was only a short delay in plaintiff receiving that medication, without any evidence that the delay was attributable to the actions of Dr. Bal or Dr. Wedell. Similarly, there is no evidence that defendants had any role, the next day, in the pharmacy being out of stock of the prescribed dosage of Percocet. Moreover, on the same day, December 2, 2006, Dr. Wedell prescribed an alternate dosage of Percocet, which plaintiff received immediately. It is clear that, throughout this period of time, plaintiff received ongoing medical attention and care. While the omissions in his pain medications were unfortunate, there is no evidence to support a finding that defendants acted with deliberate indifference.

Similarly, there is no evidence to support a finding that the two-day delay in plaintiff receiving his prescription for the anti-inflammatory nasal spray (Afrin), prescribed by UCD-ENT specialist Dr. Tate, on December 1, 2006, was due to the deliberate indifference of defendants.

---

[17] Dr. Wedell testified that, on December 2, 2006, plaintiff did not receive his prescribed Percocet (Oxycodone) (7.5/325 mg), because out of stock at the CSP-SAC pharmacy. (Wedell Depo., Exh. 16 at 2.) Dr. Wedell testified that, later that day, at 3:20 p.m., he approved by telephone plaintiff's prescription for a different amount of Percocet (5/325 mg, 1 tab every 6 hours for 7 days). (Id. at 27-8; Exh. 15.) Dr. Wedell testified that he would not necessarily have been contacted by the CSP-SAC pharmacy or nursing staff if the medication was not made available to plaintiff that evening. (Id. at 28-37.) However, plaintiff does not contend that he failed to receive this modified prescription.

As Dr. Wedell testified, he did not know the reason for the delay. (Wedell Depo. at 24-7.)

For these reasons, the court finds that plaintiff received constitutionally adequate care following his biopsy. Accordingly, summary judgment should be granted for defendants Bal and Wedell on plaintiff's deliberate indifference claims for this period.

F. Alleged Deliberate Indifference to Plaintiff's Pain Symptoms After His Surgery

It is undisputed that plaintiff experienced pain symptoms after his February 26, 2007 surgery. Plaintiff contends that various defendants were deliberately indifferent to these symptoms over the course of his recovery.

1. Alleged Deliberate Indifference by Dr. Bal

Plaintiff contends that Dr. Bal was deliberately indifferent to plaintiff's serious medical needs when, on March 6, 2006, he reduced plaintiff's prescription for Percocet from that recommended by UCD pharmacist Dr. Cello.[18] The reduction is undisputed. Dr. Cello recommended a continuation of the following prescription: 5/325 mg, 1 to 2 tabs every 4 to 6 hours. Dr. Bal reduced this prescription to the following: 5/325 mg, 1 tab three times a day.

Plaintiff also challenges Dr. Bal's temporary reduction in plaintiff's prescription for MS Contin. However, as Dr. Bal reasonably explained, after plaintiff's admission to the emergency clinic on March 6, 2007, and before plaintiff agreed to go to the OHU, Dr. Bal discontinued the MS Contin due to concerns about plaintiff's safety if he remained in the general population. Shortly thereafter (within two hours), Dr. Bal reinstated the MS Contin after plaintiff agreed to stay at the OHU where he could be monitored. (Bal Depo. at 40-5; Exhs. 16, 17.)

Review of plaintiff's pertinent medical records reveals that, during this period, plaintiff was prescribed both MS Contin and Percocet. Dr. Bal testified that plaintiff was also prescribed

[18] Plaintiff's further allegations that he received inadequate pain medications during this post-surgical period lack any evidentiary support in the record. Finding no evidentiary support for these allegations, the court does not address them, viz., that plaintiff did not receive Percocet at noon or in the evening of March 8, 2007; that he did not receive MS Contin on March 9, 2007 (though he concedes he received Tramadol); and that he received no pain medication on March 14 or 15, 2007 (though he concedes that his post-surgical pain medications were scheduled to stop on March 12, 2007, and that he obtained a prescription for high-dose Motrin on March 16, 2007).

Tramadol, which contained Tylenol, a total of four significant pain medications. Dr. Bal explained, "we basically gave him Tylenol, Tramadol, MS Contin scheduled, and Percocet as needed. . . .[T]hese are all the pain medications that he was put on when he went to the OHU. . . . The point I'm making is he was on very aggressive pain medicines . . . ." (Bal Depo. at 50-1.) Dr. Bal opined that plaintiff's pain medications, as prescribed, were "strong but they were appropriate" (id. at 56-7), based on the unique considerations for assessing the appropriateness of a prisoner's pain medications (id. at 66-7):

> [I]npatient care is sometimes much more liberal But for a guy who has never been on such heavy doses of narcotics . . . we go back on MS Contin, which is the longer-acting opiate. And then the Percocet is more for breakthrough pain. But . . . Inmate Kilgore probably didn't realize he was also on Tramadol when we put him in OHU. . . . Tramadol is a nonsteroidal anti-inflammatory. Percocet is an anti-inflammatory with narcotics, but MS Contin . . . is basically an opiate derivative. . . . [T]his takes me back to the appropriateness of what specialists write outside, that we are not obligated to just by default follow exactly every single recommendation because you look at what is the long-acting one, you look at where he's going to be housed. But you want to make sure that his pain is adequately addressed.

Asked to comment on plaintiff's administrative grievance challenging the quality of his post-surgical care at CSP-SAC, including a challenge to his pain medications, Dr. Ball testified (Bal Depo. at 64-6):

> [Plaintiff] never informed me in person when I even did his history and physical in the [OHU] infirmary that he did not get his medication. So I'm actually even talking on March 7th, which is the day after when I saw him in OHU. I examined him, we went through the whole treatment plan. . . .[Indeed, he told me he was feeling really so much better that he wanted to go back to C Facility.] I think he received really top-of-the-line medical care. He was seen promptly after he fell in his cell, he was seen and evaluated by an RN.
>
> We made the . . . decision to give him IV fluids. Initially the reason his pain medications were discontinued, which never in reality got discontinued, was the overall picture of dizziness and light headedness, which was of great concern to me.
>
> He had to be sent to [OHU] again for his safety, observation, and making sure that he got all of these medications in a timely fashion. We gave him the fluids . . . put him back on medications. . . .
>
> I personally think his level of medical care was honestly by all means community standards. In some ways it beats community

standard, but it definitely meets community standards.

Finally, Dr. Bal testified that plaintiff never complained to him, during his post-surgical period, that his pain medications were inadequate (Bal. Depo. at 67-8):

> I saw him so many times that I would have really thought he would have told me something in the event that his pain was out of control or it was not adequately managed or if he was not getting his medication. I can't imagine him not telling me. He's a very high-functioning inmate. He was very much involved in his care. . . . I don't ever recall him having a conversation about not getting medications, so I really didn't have a reason to really worry that my orders were not getting followed through.

To prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment "was medically unacceptable under the circumstances," and was chosen "in conscious disregard of an excessive risk to [the prisoner's] health." Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996) (citation omitted). Plaintiff has failed to present any evidence from which to infer that the course of pain medications Dr. Bal prescribed him post-surgically was "medically unacceptable." Moreover, plaintiff has not demonstrated a material factual dispute as to whether Dr. Bal, in exercising his medical judgment as to plaintiff's post-surgical pain medications, did so in "conscious disregard of an excessive risk" to plaintiff's need for adequate pain relief. Again, plaintiff's complaints rest on his disagreement with Dr. Bal about the proper course of plaintiff's treatment.

For these reasons, the court finds that plaintiff received constitutionally adequate post-surgical care. Accordingly, summary judgment should be granted for defendant Bal on plaintiff's deliberate indifference claims for this period.

2. Alleged Deliberate Indifference by LVN Forshay

Plaintiff makes three allegations against LVN Forshay, specifically, that: (1) on March 8, 2007, Forshay "blatantly disregarded" plaintiff's request for Percocet; (2) on March 11, 2007, in response to plaintiff submitting a sick-call slip requesting a continuation of his pain medications, Forshay allegedly told plaintiff he should not be experiencing that much pain, and refused to call a doctor (note that the issues concerning plaintiff's pain medications do not state a deliberate indifference claim as discussed above); and (3) on March 18, 2007, Forshay refused to provide

plaintiff with the sterile cleaning supplies required for the self-care of his surgical incision.

These allegations fail to demonstrate that plaintiff was harmed by a purposeful act or failure to act by defendant Forshay. See Jett, 439 F.3d at 1096 (the second prong of a deliberate indifference claim requires a showing that defendant's purposeful act or failure to act caused plaintiff harm).

Because these are the only claims against defendant Forshay, summary judgment should be granted in her favor.

3. Alleged Deliberate Indifference by CO Hampton

Plaintiff's contends that CO Hampton was deliberately indifferent to plaintiff's pain symptoms on the afternoon of March 6, 2007, when plaintiff returned to the general population following his surgery. Hampton, who worked in the Control Booth, called medical staff when plaintiff initially asked him to, at approximately 2:30 p.m., and reported back that plaintiff would have to wait until evening "pill call" for his pain medication. Hampton then refused the request of plaintiff's cellmate, at approximately 5:30 p.m., to again call medical staff.

The evidence demonstrates that defendant Hampton acted reasonably under the circumstances. Hampton contacted medical staff upon plaintiff's initial request, and then relayed to plaintiff the decision that he would have to wait until the regular time to receive his pain medication. It is undisputed that a correctional officer is unqualified to make a medical diagnosis or decision, and is required to defer to medical staff concerning the medical care of prisoners. Hampton also acted reasonably when plaintiff's cellmate later made the same request. Hampton apparently asked CO Omande to check on plaintiff. Then, when plaintiff collapsed, Hampton and other correctional staff obtained immediate emergency medical care for plaintiff.

The court finds no reasonable inference based on the evidence that defendant Hampton knew of or disregarded an excessive risk of serious harm to plaintiff by adhering to the decision of medical staff that plaintiff would need to wait until evening pill call to address his medication request. Toguchi, 391 F.3d at 1057.

As this is the only claim against defendant Hampton, summary judgment should be granted in his favor.

4. Alleged Deliberate Indifference by LVN Winton

Plaintiff alleges that defendant LVN Winton is the nurse who informed CO Hampton that plaintiff would have to wait until the evening pill call to receive his pain medication, and then, when plaintiff was taken to the emergency clinic, refused to increase plaintiff's dosage for Percocet beyond that prescribed by Dr. Bal. Plaintiff contends that both of these alleged acts demonstrated deliberate indifference to plaintiff's serious medical needs.

In his responses to plaintiff's Request for Admissions, defendant Winton conceded that he was responsible for distributing medications to C Facility inmates on March 6, 2007, from 2:00 p.m. to 10:00 p.m. (See Winton's Responses to Plaintiff's Request for Admissions Nos. 15-17.) However, Winton does not recall receiving a call from defendant Hampton on March 6, 2007, or responding to a medical emergency that involved plaintiff. Winton also testified that, absent exigent circumstances, inmates generally have to wait until the next "med pass" to address their individual medication requests, when a nurse has the opportunity to talk directly with the inmate. (Winton Depo. at 12-20, 22-3.) Winton explained that, "[i]f the guy is saying he's having chest pains. . . I've got to act on that" (id. at 15); otherwise, he was required to abide by physician medication orders. Winton explained, "we always have to follow a doctor's order. As a nurse I – I have to follow exactly what the medicine is" (id. at 13); "if [the inmate] doesn't have any order right then and there, I'm kinda dead in the water as far as administering the meds" (id. at 14).

This testimony demonstrates that, even if plaintiff could prove that LVN Winton was the nurse who informed CO Hampton, on the afternoon of March 6, 2007, that plaintiff would need to wait until evening pill call to address his medication request, Winton lacked the authority to modify plaintiff's prescription. Additionally, while plaintiff was status post-surgery, there is no evidence to suggest that plaintiff's appearance or initial request to Hampton demonstrated exigent circumstances, or that plaintiff could not reasonably wait until the evening pill call, which usually took place between 5:00 p.m. and 7:00 p.m. (Winton's Response to Plaintiff's Interrogatory No. 7.) Thus, there is no evidence to support an inference that LVN Winton acted with reckless disregard for plaintiff's known medication needs, either by denying plaintiff's initial medication request, or by failing to pursue the matter with a physician.

Additionally, plaintiff has failed to state an Eighth Amendment claim based on LVN Winton's alleged later adherence to Dr. Bal's reduced Percocet prescription, during the period of plaintiff's emergency care on March 6, 2007, from approximately 5:30 p.m. until 9:15 p.m. As explained by Dr. Bal, and undisputed by the parties, nurses do not have the authority to change a physician's prescription. (Bal Depo at 67.)

For these reasons, summary judgment should be granted for defendant Winton.

G. Alleged Deliberate Indifference in Securing Plaintiff's Fourth Post-Op Appointment

Plaintiff contends that defendants Bal, Wedell, Dunne and Kelly were each deliberately indifferent to plaintiff's serious medical needs by failing to timely schedule plaintiff's fourth post-operative appointment.

Plaintiff does not dispute the timeliness of his first three post-operative appointments. Following plaintiff's February 26, 2007 surgery, and return to CSP-SAC on March 6, 2007, these appointments took place on March 16, 2007, April 20, 2007, and June 7, 2007. At the first appointment (March 16, 2007), UCD-ENT specialist Dr. Senchak noted that plaintiff was "doing well at postop three weeks," and requested that plaintiff return in three weeks. (Dfs. Exh. B at 228-29.) While the second appointment was six weeks later (April 20, 2007), UCD-ENT specialist Dr. Chopra found that plaintiff was still "doing well" and should return in six weeks. (Dfs. Exh. B at 230.) At the third appointment, seven weeks later (June 7, 2007), Dr. Chopra found that plaintiff "continues to do well," and requested that plaintiff return in three months. (Pltf. Exh. at 166.)

The confusion and problems attendant to the scheduling of plaintiff's fourth post-operative appointment are detailed above, including plaintiff's transport to UCD on September 21, 2007, only to discover that the appointment had been previously scheduled for August 21, 2007. As summarized in the Director's Level Review decision responsive to plaintiff's administrative grievance submitted November 19, 2007 (No. SAC-H-07-02642), "there was an unfortunate misunderstanding between the UCD specialty scheduling office and the SAC outpatient medical consult staff. As soon as the error was discovered the appellant was immediately rescheduled for follow-up with the UCD-ENT Clinic." (Pltf. Exh. at 168-69.)

Nevertheless, plaintiff had to wait seven-and-one-half months, rather than the requested three months, for his fourth post-operative appointment on January 24, 2008. Significantly, however, at that appointment Dr. Chopra again found that plaintiff was "doing well," with "no significant signs or symptoms." (Pltf. Exh. at 165.) Dr. Chopra stated that UCD-ENT would continue to follow plaintiff "regularly," "on a three to four monthly basis," unless plaintiff needed to be seen earlier. (Id.)

Dr. Chopra's assessment demonstrates that plaintiff suffered no harm as a result of the delay in scheduling his fourth follow-up appointment. Absent a showing of harm resulting from a delay in receiving medical care, a prisoner cannot support a deliberate indifference claim. Berry, 39 F.3d at 1057; McGuckin, 974 F.2d at 1059; Wood, 900 F.2d at 1335. Therefore, the court finds no merit to plaintiff's deliberate indifference claims against defendants Bal, Wedell, Dunne, and Kelly based on the delay in scheduling plaintiff's fourth post-operative appointment.

VII. Conclusion

For the foregoing reasons, IT IS HEREBY RECOMMENDED that:

1. Defendants' motion for summary judgment (ECF No. 142), be granted; and

2. Summary judgment be granted in full on behalf of defendants Borges, Wedell, Bal, Winton, Forshay, Dunne, Kelly and Hampton.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be filed and served within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: February 21, 2014

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

/ kilg2485.msj